467 So.2d 723 (1985)
The STATE of Florida, Appellant,
v.
Egar GONZALEZ, Appellee.
Nos. 83-29, 83-75.
District Court of Appeal of Florida, Third District.
March 26, 1985.
Rehearing Denied May 10, 1985.
*725 Jim Smith, Atty. Gen., Janet Reno, State Atty. and Anthony C. Musto, Asst. Atty. Gen., for appellant.
John H. Lipinski, Miami, for appellee.
Michael P. Farris, (Olympia, Wash.), for Concerned Women for America, as amicus curiae.
Before BARKDULL and HUBBART and FERGUSON, JJ.
HUBBART, Judge.
This is an appeal by the State of Florida from two trial court orders entered in a criminal case. The first order dismisses two counts, charging aggravated battery and manslaughter, in a three-count information filed below against the defendant Egar Gonzalez, a medical doctor who allegedly performed an illegal abortion on a minor. The second order suppresses as evidence certain medical records and statements obtained from the defendant by law enforcement agents. For the reasons which follow, we affirm the dismissal order, reverse the suppression order, and remand the cause for further proceedings on the remaining count of the information charging unlawful termination of pregnancy.

I
Turning first to the dismissal order, we agree entirely with the trial court's decision rendered below which grants the defendant's motion to dismiss on the second and third counts of the information charging aggravated battery and manslaughter. We further approve the trial court's legal analysis in reaching these results as contained in the order under review, to wit:
"Count II: Aggravated Battery
§ 784.045(1)(b)
Dr. Gonzalez is next charged with committing an aggravated battery upon Tevra Eaford during the performance of the June 25th abortion by intentionally touching or striking her against her will with a deadly weapon (metallic instruments) resulting in perforation and damage to her uterus and intestines, violating § 784.045(1)(b).
An essential element of battery is that it be against the will of the victim. In the instant case, Tevra Eaford was a patient seeking assistance from physician-Defendant Gonzalez in terminating her pregnancy via a surgical procedure.
Part of the patient-physician relationship involved the execution of a consent form by both Tevra Eaford, a minor, and Deanne Cason, her mother. The consent form specifically stated, `I understand the possibility of perforation of the uterus and internal injuries resulting therefrom.'
The touching of the victim occurred during the surgical procedure, was consented to, and the complications were foreseeable. If Tevra Eaford has a cause of action, it is in a civil case, not a criminal prosecution.
Defendant's Motion to Dismiss Count II of the Information is Granted.
Count III: Manslaughter
§ 782.07
The third Count of the Information charges Dr. Gonzalez with violation of Florida Statute § 782.07 by inflicting on a female fetus wounds and injuries during the course of the June 25th abortion which resulted in death without justification, said killing not being excusable homicide or murder.
The heart of this issue is whether a fetus is a human being within the meaning of the Florida manslaughter statute.
At common law, the killing of a fetus was not homicide unless the child was born alive and then expired as a result of *726 the injuries previously sustained. The Supreme Court in Roe [v. Wade], supra [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147], found that generally the unborn have never been recognized in the law as persons in the whole sense. Even when statutory classifications are carved out to extend rights to fetuses, there is a different standard of construction which must be applied when comparing criminal law with the law of tort or property.
Extensive reference has been made to the Florida Supreme Court statement in Stern v. Miller, 348 So.2d 303 (1977) that `[a] viable fetus is a human being capable of independent existence outside the womb; a human life is therefore destroyed when a viable fetus is killed ...' Id. at 306. The fact that this was a negligence suit seeking to extend Florida's Wrongful Death Act to include a fetus within the definition of `person' and that the Court ultimately declined to expand the definition to include a viable fetus is ignored. Rather, this Court is told to accept Stern as the current common law definition, to-wit: a viable fetus is a human being; further, that a fetus is now included under the Manslaughter Statute because the Florida Legislature re-enacted codifications of the Florida Statutes in both 1979 and 1981 and is presumed to know existing decisional law. The argument fails to consider the 1979 Legislature which enacted § 390.001(10) making it a felony of the third degree to perform post viability abortions. The better reasoning is that the Legislature believes §§ 390.001(10) and 782.09 (the current feticide statute) are adequate protections for the unborn. If it chooses to expand the protection, then it can specifically do so. California is a case in point. The legislature amended its murder statute, to-wit: `the unlawful killing of a human being, or a fetus, with malice aforethought.' Florida could amend § 782.07 to make manslaughter `the killing of a human being or viable fetus by the act, procurement or culpable negligence of another without lawful justification.'
The Florida Legislature has indicated it is capable of distinguishing between an unborn child and a person born alive since it has enacted statutes which acknowledge this distinction. When we are concerned with a statute that is clearly penal in nature, it must be narrowly construed and the Defendant must be given the benefit of any reasonable doubt as to whether the act charged is within the meaning of the Statute. Evidence of great concern for viable fetuses (§ 390.001(5)) or implicit construction of Stern v. Miller, supra, as modifying the common law definition of human being to include viable fetuses cannot withstand judicial scrutiny nor constitutional muster.
Since `human being' is not defined in Florida Statutes and until the Florida Legislature specifically changes it, the common law definition controls. The fetus involved in this case was not born alive. The Motion to Dismiss Count III is Granted."
R. 203-09.
We are supported in our approval of the trial court's dismissal order by two recent district court decisions. State v. McCall, 458 So.2d 875 (Fla. 2d DCA 1984) (no crime of vehicular homicide or DWI manslaughter against a viable fetus); Love v. State, 450 So.2d 1191 (Fla. 4th DCA 1984) (no crime of aggravated battery against a viable fetus). The dismissal order under review is therefore affirmed.

II
Turning next to the suppression order, we are unable to agree with the trial court that certain medical records of the defendant Gonzalez, and certain oral statements made by the same defendant to law enforcement agents, were unlawfully obtained and therefore subject to being suppressed as evidence at trial. This evidence was obtained from the defendant Gonzalez during a joint investigation of the said defendant by Metro Dade police officers and agents of the Florida Department of Professional Regulation. The trial court order *727 suppressed such evidence upon a holding that (1) the medical records were obtained through an unreasonable search and seizure in violation of the defendant's rights guaranteed by the Fourth Amendment, (2) the medical records were obtained in violation of the defendant's privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and (3) the statements of the defendant were improperly obtained in the absence of Miranda warnings. For reasons more fully developed below, we hold that the suppression order is erroneous and must be reversed.

A
The facts pertaining to the suppression issue, as stated in the trial court's order of suppression, are as follows:
"Defendant, Edgar Gonzalez, a physician licensed to practice medicine in the State of Florida, is alleged to have performed a late termination of pregnancy on June 25, 1982, on a twelve year old black female, Tevra Eaford.
Metro Dade Police Department Homicide Detective Hugo Gomez commenced an independent investigation into the circumstances surrounding the death of the fetus which resulted from this termination of pregnancy. He obtained information from Eaford, her mother Deanne Cason, a lieutenant from Fire Rescue who transported Eaford to a local hospital, a physician who operated on her and removed the fetus at South Miami Hospital, and from an associate Medical Examiner who performed an autopsy on the fetus. Gomez was then contacted by Agent McDonough of the Department of Professional Regulation (DPR). McDonough informed Gomez that an administrative complaint had been received against Dr. Gonzalez regarding the June 25th abortion. Gomez and McDonough began to plan and coordinate a joint visit to the doctor's office, the primary purpose being to secure the doctor's medical records on Eaford. Gomez did not obtain a search warrant for this visit but relied on DPR's authority to obtain information for an administrative investigation instead.
Agent McDonough had the victim's mother sign a DPR authorization form to release her daughter's medical records. Detective Gomez testified he had oral authorization from the mother to obtain these records as well.
Four officials entered Defendant's medical office, two from Metro Dade Homicide and two from DPR, exhibited their official credentials and went into a private office away from the reception area.[1] The testimony shows that Detective Gomez began the conversation immediately upon entry, introducing himself and the people with him, and after a brief exchange,[2] Dr. Gonzalez handed his medical records of Tevra Eaford to Detective Gomez. The testimony further shows that the Defendant was not advised he was the focal point of a criminal investigation, that he had a right to counsel, that he had a right not to make any statements, and that the material he was providing the police officer could be used against him in a criminal prosecution. During this time but after Gonzalez handed over the records, Agent McDonough was searching through his briefcase to locate the authorization form. Gomez made one copy of the records to leave with the doctor. While these individuals were still in the doctor's office, a *728 call was received from his attorney. The attorney spoke with the doctor and Gomez. He specifically instructed Gomez not to speak further with his client and to return any records given over by the doctor. Gomez's response was that he had the records and wasn't going to give them back. The four left the office with Detective Gomez in possession of the original medical records. Later, he made a copy for DPR for use in its investigation."
R. 218-19.

B
First, based on the above facts, it seems clear that when Detective Gomez initially requested to see the subject medical records and the defendant Gonzalez produced them for police inspection, the initial production was made freely and voluntarily and was therefore not a "search" within the meaning of the Fourth Amendment. Detective Gomez and his associates did not forcibly enter the defendant's medical office, but were invited in after requesting permission to see the defendant; they then spoke to the defendant, not in the coercive setting of a police interrogation room, but in the familiar surroundings of the defendant's own office; and they neither ordered, directed nor threatened the defendant in any way to produce the subject medical records, but, instead, through Detective Gomez merely requested permission to see the records, if available, and the defendant obliged. Although no Miranda warnings were given prior to this request, none were required in order to render the subsequent production free and voluntary. See Schneckloth v. Bustamonte, 412 U.S. 218, 231-32, 248-49, 93 S.Ct. 2041, 2049-50, 2058-59, 36 L.Ed.2d 854 (1973). Based on well-settled principles of Fourth Amendment law, there was plainly no indicia of coercion in this setting which could render involuntary the defendant's initial production of the subject medical records to Detective Gomez so as to convert this production into a "search" under the Fourth Amendment. See Schneckloth v. Bustamonte, supra; State v. Oliver, 368 So.2d 1331, 1335 (Fla. 3d DCA 1979), cert. dismissed, 383 So.2d 1200 (Fla. 1980), and authorities collected.
Second, it seems equally clear that when Detective Gomez (a) refused to return the subject medical records to the defendant Gonzalez after being requested to do so by the defendant's attorney, and (b) left the medical office with the records in hand, a police "seizure" of these records took place within the meaning of the Fourth Amendment. "A `seizure' of property [under the Fourth Amendment] occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, ___ U.S. ___, ___, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984) (footnote omitted). Plainly, under these circumstances, there was a "meaningful interference" with the defendant's possessory interests in the subject medical records which the defendant in no way consented to when Detective Gomez refused to return the medical records upon request and left the office with the records in hand. Even though, as the state contends, the defendant's revocation of consent through counsel did not retroactively invalidate the prior police inspection of the records, it did serve to withdraw his consent to any future police retention and inspection of his records. 2 W. LaFave, Search and Seizure § 8.1, at 633-35 (1978), and authorities collected. It therefore follows that Detective Gomez' non-consensual retention of the subject medical records constituted a "meaningful interference" with the defendant's possessory interests in the records and, accordingly, a police "seizure" thereof within the meaning of the Fourth Amendment.
Third, the police seizure of the subject medical records was, in our view, a reasonable seizure within the meaning of the Fourth Amendment because it was based on probable cause. Indeed, in its order of suppression, the trial court specifically found that probable cause existed for the seizure of the medical records, had a search warrant been applied for, based on *729 the prior police investigation in this case.[3] It has recently been held that a warrantless police seizure of property accomplished without a search, as here, is reasonable under the Fourth Amendment where it is based on probable cause; no search warrant is required because a seizure of property, as opposed to a search, does not implicate privacy interests. Segura v. United States, 468 U.S. ___, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); United States v. Jacobsen, supra. It therefore follows that the warrantless police seizure of the medical records did not violate the defendant's Fourth Amendment rights as it was based on probable cause.[4]
Fourth, the defendant's rights under the Fifth Amendment were not violated by this seizure because the defendant was not compelled to give evidence against himself. He was not, for example, compelled by a subpoena duces tecum to produce incriminating personal records and by that act of production authenticate the incriminating evidence; he was not compelled by the state to put anything incriminating in the medical records herein; indeed, he was not compelled by the state to do anything. He was instead the passive victim of a police seizure of his medical records, the contents of which had been voluntarily committed to writing by the defendant long before the seizure herein. Under virtually identical circumstances, the United States Supreme Court has held that a defendant's Fifth Amendment rights are not violated by a police seizure of records. Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).[5]
Fifth, the defendant's oral statements made to the police during this entire episode in the medical office were clearly not subject to suppression. Without question, the defendant was not subjected to custodial interrogation and no Miranda warnings were therefore required; indeed, the defendant was never arrested or detained in any way during this entire episode. Absent custodial interrogation, it has been repeatedly held that Miranda warnings need not be given during a law enforcement interview with a criminal suspect, regardless of the interviewer's subjective intent to elicit incriminating evidence, and that any voluntary statements, as here, which are elicited during such a non-custodial interview are admissible in evidence. Minnesota v. Murphy, ___ U.S. ___, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Moreover, it cannot be said that the statements herein were inadmissible as constituting the fruit of an illegal arrest or search of the defendant because, as previously shown, the defendant's Fourth Amendment rights were in no way violated by the police.
Inasmuch as the medical records and oral statements were obtained by the police from the defendant Gonzalez without violating *730 the defendant's rights guaranteed by the Fourth and Fifth Amendments to the United States Constitution, the trial court was in error in entering its order of suppression. The suppression order is therefore reversed.

III
For the reasons stated above, (1) the trial court order dismissing the aggravated battery and manslaughter counts of the information is affirmed, and (2) the trial court order suppressing the defendant's medical records and oral statements is reversed and the cause is remanded for further proceedings on the remaining count of the information charging unlawful termination of pregnancy.
Affirmed in part, reversed in part and remanded.
FERGUSON, J., concurs.
BARKDULL, Judge, dissenting in part.
I agree with the majority opinion in affirming dismissal of the aggravated battery and manslaughter counts, but I disagree with the reversal as to the order suppressing the medical records and oral statements and I would affirm this order also upon the reasoning of the trial judge.[1]
NOTES
[1] The uncontradicted testimony in the record establishes that the officers displayed their credentials to the office receptionist and asked to see the defendant Gonzalez at a location away from the reception area so as not to disturb patients who were waiting to be seen. They were, in turn, shown to an inner office just off the reception area where they waited for and later spoke to the defendant Gonzalez. (Tr. 49-50; 101-02, 114-15).
[2] The testimony in the record is uncontradicted that the defendant Gonzalez asked the officers what he could do for them and that Detective Gomez said that they would like to see Tevra Eaford's medical files "if he had those available." (Tr. 103). The defendant Gonzalez replied, "Yes, I do" (Tr. 103), walked to the file cabinet behind his desk and produced the requested files. (Tr. 103-04).
[3] "It is the specific finding of this Court that the information obtained by Detective Gomez prior to his visit to the defendant's medical office was sufficient to constitute probable cause against the defendant for violation of §§ 390.001(2) and 782.09. This probable cause would support the issuance of ... a search warrant to obtain defendant's medical records." (R. 220).
[4] Alternatively, the seizure herein could also be upheld as falling within the "plain view" exception to the search warrant requirement rule, providing that the dubious "inadvertence" element is no longer considered viable. Detective Gomez lawfully observed the medical records in question after they were voluntarily produced by the defendant; he also had probable cause to believe that the medical records constituted evidence of a crime. This showing satisfies the basic elements of the aforesaid "plain view" exception. Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).
[5] To the extent that Florida may follow a different rule, but see Tsavaris v. Scruggs, 360 So.2d 745, 751-52 (Fla. 1978), the defendant's privilege against self-incrimination guaranteed by Article I, Section 9 of the Florida Constitution was also not violated because there is no showing that the seized medical records contain a confession by the defendant, a necessary precondition to a successful assertion of the Florida privilege against self-incrimination in these circumstances. See State v. Gibson, 362 So.2d 41 (Fla. 3d DCA 1978), cert. denied, 368 So.2d 1367 (Fla. 1979); Hampton v. State, 308 So.2d 560 (Fla. 3d DCA), cert. denied, 317 So.2d 78 (Fla. 1975); Kircheis v. State, 269 So.2d 16 (Fla. 3d DCA 1972).
[1] The order reads as follows:

ORDER ON DEFENDANT'S MOTION TO SUPPRESS
"Defendant, EGAR GONZALEZ, a physician licensed to practice medicine in the State of Florida, is alleged to have performed a late termination of pregnancy on June 25, 1982, on a twelve year old black female, TEVRA EAFORD.
Metro Dade Police Department Homicide Detective HUGO GOMEZ commenced an independent investigation into the circumstances surrounding the death of the fetus which resulted from this termination of pregnancy. He obtained information from EAFORD, her mother, DEANNE CASON, a lieutenant from Fire Rescue who transported EAFORD to a local hospital, a physician who operated on her and removed the fetus at South Miami Hospital, and from an associate Medical Examiner who performed an autopsy on the fetus. GOMEZ was then contacted by Agent McDONOUGH of the Department of Professional Regulation (DPR). McDONOUGH informed GOMEZ that an administrative complaint had been received against DR. GONZALEZ regarding the June 25th abortion. GOMEZ and McDONOUGH began to plan and coordinate a joint visit to the doctor's office, the primary purpose being to secure the doctor's medical records on EAFORD. GOMEZ did not obtain a search warrant for this visit but relied on DPR's authority to obtain information for an administrative investigation instead.
Agent McDONOUGH had the victim's mother sign a DPR authorization form to release her daughter's medical records. Detective GOMEZ testified he had oral authorization from the mother to obtain these records as well.
Four officials entered Defendant's medical office, two from Metro Dade Homicide and two from DPR, exhibited their official credentials and went into a private office away from the reception area. The testimony shows that Detective GOMEZ began the conversation immediately upon entry, introducing himself and the people with him, and after a brief exchange, Dr. GONZALEZ handed his medical records of TEVRA EAFORD to Detective GOMEZ. The testimony further shows that the Defendant was not advised he was the focal point of a criminal investigation, that he had a right to counsel, that he had a right not to make any statements, and that the material he was providing the police officer could be used against him in a criminal prosecution. During this time but after GONZALEZ handed over the records, Agent McDONOUGH was searching through his briefcase to locate the authorization form. GOMEZ made one copy of the records to leave with the doctor. While these individuals were still in the doctor's office, a call was received from his attorney. The attorney spoke with the doctor and GOMEZ. He specifically instructed GOMEZ not to speak further with his client and to return any records given over by the doctor. GOMEZ's response was that he had the records and wasn't going to give them back. The four left the office with Detective GOMEZ in possession of the original medical records. Later, he made a copy for DPR for use in its investigation.
Defendant seeks to suppress any statements made by him during this confrontation and to suppress all records taken from him. Defendant contends this evidence was seized without a search warrant, without Miranda warnings and without consent. The State's position is that no seizure occurred because Defendant voluntarily made statements and supplied records. In the alternative, the State argues if a seizure occurred, it was authorized pursuant to § 455.241 requiring physicians to release patient records upon receipt of patient authorization and further, that such seizure is permissible under the State's power to protect the public health and safety. The State also argues that since no custodial interrogation occurred, there was no need to provide Defendant with constitutional warnings.
It is the specific finding of this Court that the information obtained by Detective GOMEZ prior to his visit to the Defendant's medical office was sufficient to constitute probable cause against the Defendant for violation of §§ 390.001(2) and 782.09. This probable cause would support the issuance of an arrest warrant for the Defendant's person and for a search warrant to obtain Defendant's medical records. It is the further finding of this Court that in addition to being the focal point of a criminal investigation, an administrative proceedings by DPR was also underway.
ADMINISTRATIVE SEARCH AND SEIZURE:
§ 455.241 requires a licensed physician, upon the written request of a patient, to furnish that person or his legal representative with copies of all reports made incident which he was investigating. The fact that this statute says the physician shall furnish copies of medical records on request of the patient or the patient's representative cannot override his constitutional protection against involuntary self-incrimination. Dr. GONZALEZ did have a privilege to refuse to produce the records regardless of any written authorization. The statute is designed to provide a convenient means for the release of medical information out of court and to protect physicians from patients' claims of personal privacy or privileged communications. Melanson v. Nelson, 366 So.2d 1191 (1st D.C.A. 1979). The Defendant's attorney revoked any consent which may have been given, thereby invoking the Defendant's constitutional protection against involuntary self-incrimination.
In conclusion, the Defendant invoked his constitutional protection against self-incrimination through his attorney to overcome any prior consent to voluntarily release the medical records based on an executed authorization form. The records were improperly taken from him.
CRIMINAL SEARCH AND SEIZURE:
The testimony reflects the defendant was advised an administrative investigation had commenced by DPR. He was never advised of the police investigation nor that he was now the focal point of that investigation. When the process shifts from investigatory to accusatory, when it focuses on the accused and its purpose is to elicit a confession, our adversary system begins to operate. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).
The setting described from the testimony was that of the Defendant, alone in a private room, with four credentialed officials. In this coercive setting, it is doubtful the original action taken by the doctor was voluntary. He was merely acquiescing to their apparent authority to inquire of him and to take his records. M.J. v. State, 399 So.2d 996 (1st D.C.A. 1981). Assuming arguendo he voluntarily made statements and released his records, the consent was clearly revoked via telephonic communication from his attorney. Unlike State v. Grant, 392 So.2d 1362 (4th D.C.A. 1981), Dr. GONZALEZ was not free to disregard the questions and walk away due to the threatening presence of several officers, the display of weapons and the use of language indicating that compliance with the officer's request might be compelled. Unlike Login v. State, 394 So.2d 183 (3rd D.C.A. 1981), the warrantless search and seizure of the medical records was not incident to an arrest because no arrest was made at this meeting. And unlike State v. Dodd, 396 So.2d 1205 (3rd D.C.A. 1981) aff'd 419 So.2d 333, the doctor did experience coercion because of the apparent authority displayed to him.
"A distinction is recognized ... between submission to the apparent authority of an officer and unqualified consent. Mere acquiescence in a search is not necessarily a waiver of a valid search warrant." Powell v. State, 332 So.2d 105, 107 (1st D.C.A. 1976).
Detective GOMEZ had probable cause to arrest GONZALEZ, the focal point of a criminal investigation. The constitutional protections existed prior to GOMEZ's entry on the doctor's premises but the warnings were never given. The statements made and documents seized were surreptitiously obtained through the joint efforts of the police and the Department of Professional Regulation."