IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

VIRGINIA DENISE WYCHE,

      Appellant,

v.

STATE OF FLORIDA,

      Appellee.

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D15-4797

_____/

Opinion filed November 6, 2017.

An appeal from the Circuit Court for Duval County.
Mark Hulsey, Judge.

Andy Thomas, Public Defender, Victor Holder, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, Sharon S. Traxler, Assistant Attorney General, Tallahassee, for Appellee.

LEWIS, J.

      Virginia Denise Wyche, Appellant, challenges her convictions and sentences

for second-degree murder of an unborn quick child and attempted second-degree

murder of the unborn child's mother, raising eleven issues, only the first of which

merits discussion. Appellant argues that her second-degree murder conviction cannot be legally sustained because under the common law born alive rule, an unborn child is not a human being within the meaning of Florida's homicide statute, section 782.04(2), Florida Statutes (2013). We reject Appellant's argument for the reasons that follow and affirm her convictions and sentences in all other respects without further discussion.

In this tragic case, on April 23, 2014, twenty-five to twenty-six weeks into her pregnancy, the mother was shot with a .22-caliber revolver in the abdomen by Appellant, her friend, over a dispute involving the naming of the unborn quick child, with the bullet striking the unborn quick child and causing multiple injuries to the unborn child. While the mother survived the gunshot wound, the unborn quick child was not born alive and died as the result of the gunshot wound. Following trial, the jury found Appellant guilty as charged of attempted second-degree murder of the mother and guilty of second-degree murder of the unborn quick child. Thus, the issue we must resolve is whether the common law born alive rule has been abrogated by the Florida Legislature so as to allow Appellant's second-degree murder conviction to stand under section 782.04(2). Given that this issue presents a pure question of law and turns on statutory interpretation, our review is *de novo*. See Townsend v. R.J. Reynolds Tobacco Co., 192 So. 3d 1223, 1225 (Fla. 2016).

Section 782.04(2), Florida Statutes (2013), defines second-degree murder as "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." Under the common law born alive rule, "the killing of a fetus was not homicide unless the child was born alive and then expired as a result of the injuries previously sustained." State v. Gonzalez, 467 So. 2d 723, 725 (Fla. 3d DCA 1985); see also Knighton v. State, 603 So. 2d 71, 72 (Fla. 4th DCA 1992); State v. McCall, 458 So. 2d 875, 876 (Fla. 2d DCA 1984).[1]

The Florida Legislature enacted section 782.09, Florida Statutes, commonly referred to as the feticide statute, in 1868. Ch. 1868-1637, § 10, Laws of Fla. Through September 2005, the feticide statute provided that "[t]he willful killing of an unborn quick child, by any injury to the mother of such child which would be murder if it resulted in the death of such mother, shall be deemed manslaughter." § 782.09, Fla. Stat. (2005). Effective October 2005, the feticide statute was amended to provide that the unlawful killing of an unborn quick child shall be deemed

---

[1] Cf. State v. Ashley, 701 So. 2d 338, 339-42 (Fla. 1997) (noting the born alive rule, and holding that an expectant mother cannot be criminally charged with the death of her born alive child resulting from self-inflicted injuries during the third trimester of pregnancy because the common law immunity from prosecution for the pregnant woman was not abrogated by sections 390.001, 782.04, and 782.07, Florida Statutes (1993)).

manslaughter or murder in the same degree as that which would have been committed against the mother if the act had resulted in her death. Ch. 2005-119, § 2, Laws of Fla. At the time of Appellant's offenses, the feticide statute set forth:

> (1) *The unlawful killing of an unborn quick child*, by any injury to the mother of such child which would be murder if it resulted in the death of such mother, *shall be deemed murder* in the same degree as that which would have been committed against the mother. Any person, other than the mother, who unlawfully kills an unborn quick child by any injury to the mother:
>
>    . . . .
>
> (b) Which would be murder in the second degree if it resulted in the mother's death commits murder in the second degree . . . .

§ 782.09, Fla. Stat. (2013) (defining "unborn quick child" as a "viable fetus") (emphasis added).[2]

"Under our rules of statutory construction, a statute will not displace the

---

[2] Effective October 2014, the feticide statute was amended to criminalize the killing of an "unborn child," which is defined as "a member of the species *Homo sapiens*, at any stage of development, who is carried in the womb." § 782.09(1), (5), Fla. Stat. (2014); § 775.021(5)(e), Fla. Stat. (2014). Also effective October 2014, a new rule of construction was added to section 775.021, Florida Statutes (2014), which provides in part as follows:

> (5) Whoever commits an act that violates a provision of this code or commits a criminal offense defined by another statute and thereby causes the death of, or bodily injury to, an unborn child commits a separate offense if the provision or statute does not otherwise specifically provide a separate offense for such death or injury to an unborn child.

4

common law unless the legislature expressly indicates an intention to do so." Kitchen v. K-Mart Corp., 697 So. 2d 1200, 1207 (Fla. 1997) (citing Carlile v. Game & Fresh Water Fish Comm'n, 354 So. 2d 362 (Fla. 1977)). "Unless a statute unequivocally states that it changes the common law, or is so repugnant to the common law that the two cannot coexist, the statute will not be held to have changed the common law." Thornber v. City of Fort Walton Beach, 568 So. 2d 914, 918 (Fla. 1990) (citations omitted); see also Townsend, 192 So. 3d at 1231; Webb v. Sch. Bd. of Escambia Cty., 1 So. 3d 1189, 1190 (Fla. 1st DCA 2009). The 2013 version of the feticide statute presents such a sequence of events.

"The polestar of a statutory construction analysis is legislative intent." W. Fla. Reg'l Med. Ctr., Inc. v. See, 79 So. 3d 1, 8 (Fla. 2012). To discern legislative intent, the court must first look to the plain and obvious meaning of the statute's text, which may be discerned from a dictionary. Id. at 9. If the statutory language is clear and unambiguous, the court must apply that unequivocal meaning and may not resort to the rules of statutory construction. Id. "Likewise, the '[a]dministrative construction of a statute, the legislative history of its enactment, and other extraneous matters are properly considered *only in the construction of a statute of doubtful meaning.*'" Atwater v. Kortum, 95 So. 3d 85, 90 (Fla. 2012) (quoting Donato v. Am. Tel. & Tel. Co., 767 So. 2d 1146, 1153 (Fla. 2000)) (emphasis in original). This is so because the Legislature is assumed to know the meaning of the words used in

5

the statute and to have expressed its intent through the use of the words. <u>Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 945 So. 2d 1216, 1225 (Fla. 2006).

The clear and unambiguous language of the feticide statute provides that the killing of an unborn quick child may constitute murder, which is in direct conflict with the common law rule requiring the fetus to be born alive. As such, the Legislature has expressed a clear intent to recognize an unborn quick child as a human being entitled to the protection of Florida's homicide statute. Therefore, we hold that the Legislature has abrogated the common law born alive rule by enacting the 2013 version of the feticide statute as the two cannot coexist.

We recognize that our holding appears to be in conflict with <u>Knighton</u>, <u>McCall</u>, and <u>Gonzalez</u>. In <u>Knighton</u>, the Fourth District affirmed the appellant's conviction for third-degree murder of a fetus that was born alive, unlike the unborn quick child in the instant case, but subsequently died due to the injuries the appellant inflicted on the mother upon concluding that the fetus was a human being under the common law born alive rule because she was born alive. 603 So. 2d at 72-73. Significantly, the court rejected the appellant's argument that the born alive rule has been abrogated by the feticide and termination of pregnancy statutes and "suggest[ed] . . . [the rule's] continued viability in the absence of any statutory definition of 'human being.'" <u>Id.</u> at 73.

In McCall, the Second District affirmed the dismissal of the DWI manslaughter and vehicular homicide charges relating to the death of an unborn child upon holding that such crimes do not exist in Florida because an unborn child is not a human being within the definitions of DWI manslaughter and vehicular homicide, which require the death of a "human being," in light of the common law born alive rule. 458 So. 2d at 876. The court quoted the feticide statute, but stated that it did not apply because the information did not allege the willful killing of the unborn child or his mother, and "adopt[ed] the traditional interpretation of the words 'human being' under the homicide statutes as meaning one who has been born alive." Id. at 877. Conversely, in this case, the information tracked the language of the feticide statute, in addition to the homicide statute.

Finally, in Gonzalez, the Third District affirmed the dismissal of the manslaughter charge against the appellant, a doctor who allegedly performed an illegal abortion on a minor, upon holding that an unborn child is not a human being within the meaning of the manslaughter statute in light of the common law born alive rule. 467 So. 2d at 725-26. The court reasoned that the Legislature believed the feticide and abortion statutes were adequate protections for the unborn; if the Legislature chooses to expand the protections, it can expressly do so, such as by amending the manslaughter statute to criminalize "the killing of a human being or viable fetus"; the Legislature "has indicated it is capable of distinguishing between

7

an unborn child and a person born alive since it has enacted statutes which acknowledge this distinction"; and "[s]ince 'human being' is not defined in Florida Statutes and until the Florida Legislature specifically changes it, the common law definition controls." Id. While the feticide statute in effect when the alleged illegal abortion on the minor was performed on June 25, 1982, did not apply to the facts of Gonzalez, as we previously stated, under the 2013 version of the feticide statute that applies to the facts of this case, an unborn quick child is recognized as a human being entitled to the protection of Florida's homicide statute.

We, therefore, affirm Appellant's convictions and sentences and certify conflict with Knighton, Gonzalez, and McCall to the extent our holding conflicts with those decisions.

AFFIRMED; CONFLICT CERTIFIED.

B.L. THOMAS, C.J., CONCURS; ROWE, J., CONCURS WITH OPINION.

ROWE, J., concurring,

A dispute that began over a Facebook post ended with the murder of an unborn child. Markeisha Brooks, who was approaching the third trimester of her pregnancy, asked her Facebook "friends"[3] to suggest names for her baby. Virginia Denise Wyche responded to the post in a profane and belligerent manner. Brooks decided to visit Wyche at her home to attempt to resolve their disagreement in person. However, after Brooks arrived at Wyche's home, tensions between the two women escalated. While standing less than an arm's length away from Brooks, Wyche pulled a .22-caliber revolver from her waistband and shot Brooks directly in the womb. Brooks survived the bullet wound, but her unborn child did not. The bullet entered the child's abdomen and exited near the child's right shoulder. Brooks testified at trial that after the bullet entered her womb, she felt the last movements of her child as the child died. The jury found Wyche guilty of attempted second-degree murder of Brooks and guilty of second-degree murder of Brooks's unborn child.

Wyche argues that she could not legally be convicted of second-degree

---

[3] "A Facebook friendship does not necessarily signify the existence of a close relationship." *Chace v. Loisel*, 170 So. 3d 802, 804 (Fla. 5th DCA 2014).

9

murder of Brooks's unborn child because under the common law "Born Alive" Rule, an unborn child is not a human being within the meaning of Florida's homicide statute, section 782.04(2), Florida Statutes (2013). As explained in the majority opinion, the Legislature abrogated the common law when it enacted the 2013 version of the feticide statute, section 782.09, Florida Statutes, and expressed its clear intent to give protection under the homicide statute to unborn human beings from the point of viability.[4] Pursuant to the statute, a viable, unborn child is recognized as a human being entitled to the protection under Florida's homicide statute. I write to explain why, even absent Legislative abrogation, the courts should abandon the "Born Alive" Rule.

The earliest cases under the common law of England held that a defendant could not be convicted for killing an unborn child. *Commonwealth v. Morris*, 142

---

[4] In 2014, the Legislature amended the definition of "unborn child" to include any "member[s] of the species *Homo sapiens*, at any stage of development, who is carried in the womb." §§ 782.09(1), (5), Fla. Stat. (2014); § 775.021(5)(e), Fla. Stat. (2014). Thus, where a defendant's actions end the life of an unborn child, the State has rejected the viability framework employed in the context of abortion in favor of providing the broadest protection of human life. The United States Supreme Court has repeatedly held that "the State has legitimate interests *from the pregnancy's outset* in protecting the health of the woman and the life of the fetus." *See Gonzales v. Carhart*, 550 U.S. 124, 125 (2007) (emphasis added). When it comes to actions by third parties that end the life of the unborn child, the viability of the unborn child is "simply immaterial." *Smith v. Newsome*, 815 F.2d 1386, 1388 (11th Cir. 1987); *see also State v. Merrill*, 450 N.W.2d 318, 322 (Minn. 1990) ("*Roe v. Wade* protects the woman's right of choice; it does not protect, much less confer on an assailant, a third-party unilateral right to destroy the fetus.").

S.W.3d 654, 656 (Ky. 2004). During the thirteenth century when the earliest references to the Rule appear, knowledge of life in the womb was primitive and medical science was not sufficiently advanced to allow a court or jury to determine beyond a reasonable doubt whether a defendant's actions or some unrelated event was the cause of death of an unborn child. *Id.* at 657; *see also Commonwealth v. Cass*, 467 N.E.2d 1324, 1328 (Mass. 1984). Instead, live birth was the required evidentiary standard to prove that the child was alive at the time of the acts by the defendant that resulted in the alleged homicide. Coke explained the "Born Alive" Rule in this way:

> If a woman be quick with childe, and by a Potion or otherwise killeth it in her wombe; or if a man beat her, whereby the childe dieth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder: but if the childe be born alive, and dieth of the Potion, battery, or other cause, this is murder: for in law it is accounted a reasonable creature, in rerum natura, when it is born alive.

Sir Edward Coke, *Third Institute* 50-51 (1644). Thus, the "Born Alive" Rule has been frequently described as "an evidentiary principle that was required by the state of medical science of the day." *Morris*, 142 S.W.3d at 657 (quoting Clarke D. Forsythe, *Homicide of the Unborn Child: The Born Alive Rule and Other Legal Anachronisms*, 21 Val. U. L. Rev. 563, 586 (1987)).

American courts first applied the "Born Alive" Rule in the late eighteenth century. *Morris*, 142 S.W.3d at 657. Since that time, the Rule has been applied in both civil and criminal actions. *Id*. In Florida, the "Born Alive" Rule has been relied

11

upon in four reported decisions involving homicide convictions. *See State v. Ashley*, 701 So. 2d 338 (Fla. 1997) (holding that a pregnant woman who shot herself in the abdomen during her third trimester and whose child was born alive was immune from prosecution on grounds that the common law "Born Alive" Rule conferred immunity on the pregnant woman); *Knighton v. State*, 603 So. 2d 71 (Fla. 4th DCA 1992) (affirming a murder conviction of a defendant who shot a pregnant woman in the abdomen, fatally wounding her unborn child, where the child died shortly after birth); *State v. Gonzalez*, 467 So. 2d 723 (Fla. 3d DCA 1985) (relying upon the "Born Alive" Rule to affirm a trial court's dismissal of a manslaughter charge brought against a doctor who allegedly performed an illegal abortion on a minor, where the child was not born alive); *State v. McCall*, 458 So. 2d 875 (Fla. 2d DCA 1984) (holding that a viable, but unborn child could not be the victim of the crimes of vehicular homicide or DWI manslaughter). In none of these decisions did the reviewing courts consider the evidentiary purpose served by the Rule along with whether that purpose has been undermined by modern-day advancements in medical science and technology. The necessity for the Rule has long since passed, and serving no purpose, the Rule should no longer be applied.

Medical experts in the twenty-first century possess exponentially more knowledge about life inside the womb than did their counterparts living in the thirteenth century when the "Born Alive" Rule originated. With recent

12

developments in medical technology and neonatal medicine such as sonography, fetal heart monitoring, amniocentesis, and chorionic villus sampling, medical experts can competently establish the point at which the unborn child is viable, as well as the proximate cause of the death of the child. *See* Robert H. Blank, *Emerging Notions of Women's Rights and Responsibilities During Gestation*, 7 J. Legal Med. 411, 452 (1986); Carolyn J. Chackin, *What Potent Blood: Non-Invasive Prenatal Genetic Diagnosis and the Transformation of Modern Prenatal Care*, 33 Am. J.L. & Med. 9, 10-11 (2007). Because medical experts can offer reliable testimony on viability and cause of death, the evidentiary necessity of the "Born Alive" Rule no longer exists. *See McCarty v. State*, 41 P.3d 981, 986 (Okla. Crim. App. 2002) ("As medical science continues to improve and viability comes at earlier and earlier stages of the birth process, individuals should be, and will be, put on notice that their acts which lead to the death of that unborn child, once the child has attained that level of viability as determined by the medical evidence, can, and will, make them liable for the taking of the life of that unborn child."); *see also Cass*, 467 N.E.2d at 1328 ("Medical science now may provide competent proof as to whether the fetus was alive at the time of a defendant's conduct and whether his conduct was the cause of death."). Many states have already abandoned the "Born Alive" Rule, some through legislation, others by judicial decision. *See Hughes v. State*, 868 P.2d 730, 731 (Okla. Crim. App. 1994) (abandoning the "Born Alive" Rule); *State v. Horne*, 319

13

S.E.2d 703, 704 (S.C. 1984) (holding that a viable, unborn child is a "person" within the statute defining murder as the killing of "any person"); *see also Farley v. Smith*, 466 S.E.2d 522, 528 n.13 (W. Va. 1995) (providing a list of the thirty-six jurisdictions that permit tort recovery for the death of a viable, unborn child). Florida should abandon the Rule, too.

Moreover, the facts of this case amply demonstrate why the "Born Alive" Rule is no longer required to assist the trier of fact in determining whether the unborn child was alive at the time of the defendant's acts that led to the alleged homicide and whether the defendant caused the death of the unborn child. Brooks testified that she felt her unborn child's last movements, following the entry of the bullet into her abdomen. The medical evidence established that Brooks was twenty-five to twenty-six weeks pregnant at the time of the shooting. The medical examiner testified that the child was viable. He explained that at twenty-five weeks, Brooks's child had between a fifty and an eighty percent chance of surviving, and at twenty-six weeks, the survival rate would be between eighty and ninety percent. The medical examiner testified that other than the trauma resulting from the fatal gunshot wound, Brooks's child was free of any pathology, abnormalities, or congenital defects. He provided his expert opinion that Brooks's child was capable of life and that the child died because of the bullet that passed through the mother's womb into the child. Due to the medical and lay testimony in this case, the jury could determine

14

beyond a reasonable doubt whether Brooks's child was alive and viable when Wyche shot Brooks and whether the shooting was the cause of the child's death.

Accordingly, I would affirm Wyche's conviction for the second-degree murder of Brooks's unborn child. I join the majority in holding that the Legislature abrogated the "Born Alive" Rule through its enactment of the feticide statute. But I also conclude that the "Born Alive" Rule should no longer be applied in Florida because the evidentiary basis for the Rule no longer exists. Developments in modern medicine allow for experts to testify competently as to the health and development of the unborn child and the cause of the child's death. The medical evidence and testimony presented in this case was more than sufficient for the jury to determine beyond a reasonable doubt that Wyche's gunshot to Brooks's womb resulted in the death of her viable, unborn child. Because Brooks's unborn child was a human being entitled to the protection under Florida's homicide statute, Wyche's conviction should be affirmed.