LEWIS, J.
West Florida Regional Medical Center, Inc. (“West Florida Hospital”) seeks review of the decision of the First District Court of Appeal in West Florida Regional Medical Center, Inc. v. See, 18 So.3d 676 (Fla. 1st DCA 2009), asserting that it expressly and directly conflicts with a decision of the Fourth District Court of Appeal in Tenet Healthsystem Hospitals, Inc. v. Taitel, 855 So.2d 1257 (Fla. 4th DCA 2003). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
FACTUAL AND PROCEDURAL BACKGROUND

Facts

In August 2003, Lynda See complained of pain in her abdominal area during a consultation with her general physician. The general physician ordered an ultrasound which revealed a small amount of sludge in her gallbladder. Based on these ultrasound results, the general physician referred See to Dr. Mary Jane Benson, M.D., for further evaluation and treatment. Dr. Benson determined that See was in need of a laparoscopic cholecystec-tomy, i.e., a surgical removal of her gallbladder, after that examination and evaluation.
In late August 2003, Dr. Benson performed the surgery on See at West Florida Hospital. See’s common bile duct, also known as the common hepatic duct, was severed during the surgical procedure. When Dr. Benson discovered this laceration, she immediately consulted with Dr. George C. Rees, M.D. Dr. Benson and Dr. Rees were of the opinion that the appropriate medical course of action under the circumstances was to immediately perform two procedures on See — an open laparoto-my and a Roux-en-Y hepaticojejunostomy. Without See’s knowledge or consent, Dr. Benson and Dr. Rees performed those two procedures on her. Because Dr. Benson and Dr. Rees allegedly performed the procedures in a negligent, incorrect, and improper manner, See suffered additional damage to internal organs, especially to her liver. Following the procedures, Dr. Benson allegedly also failed to perform regular periodic liver diagnostic tests on See to monitor her condition.
Due to the alleged surgical errors by Dr. Benson and Dr. Rees, along with the fail *5 ure to regularly monitor See’s condition following surgery, See’s liver sustained continuing and progressive damage. The continuing deterioration of See’s liver necessitated additional surgery, which was performed on April 4, 2005. At the time this action was filed, See needed a liver transplant due to the damage caused by Dr. Benson and Dr. Rees.
After conducting the statutory pre-suit procedures provided in chapter 766 of the Florida Statutes (2006), See filed a negligence action against Dr. Benson, Dr. Rees, and West Florida Hospital. See alleged that Dr. Benson and Dr. Rees were negligent in rendering medical care to her, which resulted in excessive liver damage. See’s claims against West Florida Hospital were based on both vicarious liability for Dr. Benson’s negligence, as well as liability for the direct negligence in granting medical staff privileges to Dr. Benson and Dr. Rees, which led to the medical care and procedures performed.

Discovery Proceedings

During the discovery process that followed the filing of this action, See requested that West Florida Hospital produce all documents, rules, and regulations with regard to its surgical credentialing for laparoscopic cholecystectomy, Roux-en-Y hepaticojejunostomy, and other bile duct injury repairs, as well as all documents and evidence pertaining to the training of Dr. Benson and Dr. Rees for those procedures. See also requested that West Florida Hospital provide its entire credentialing file for Dr. Benson and Dr. Rees. Finally, pursuant to article X, section 25, of the Florida Constitution (“Amendment 7”),[1] See requested that West Florida Hospital disclose all incident reports that involved West Florida Hospital, Dr. Benson, and Dr. Rees with regard to laparoscopic cholecystectomy and Roux-en-Y hepaticojejunostomy.
West Florida Hospital objected to See’s discovery request and moved for a protective order. West Florida Hospital objected on the basis that Amendment 7 was unconstitutional under the Supremacy Clause of the United States Constitution. West Florida Hospital also alleged that, notwithstanding the passage of Amendment 7, the information requested by See was neither discoverable nor admissible for any purpose in a civil action. West Florida Hospital further contended that See was not entitled to the records of adverse medical incidents that she requested because the implementing legislation for Amendment 7 — i.e., section 381.028, Florida Statutes (2006) — stated that Amendment 7 does not repeal or otherwise alter any existing restrictions on, or privileges protecting against, the discover-ability or admissibility of records relating to adverse medical incidents otherwise provided by law. According to West Florida Hospital, this limitation included the restrictions against the disclosure of peer review and credentialing materials embodied in sections 395.0191, 395.0193, 395.0197, 766.101, and 766.1016, Florida Statutes (2006).
*6 See subsequently submitted to West Florida Hospital a subpoena duces tecum for deposition of West Florida Hospital’s CEO, Dennis Taylor. In that subpoena, See requested that Taylor bring to the deposition a series of documents, including the completed applications of Dr. Benson and Dr. Rees for medical staff privileges at West Florida Hospital, any renewal applications, a blank application for medical staff privileges used by West Florida Hospital in its peer review process, and the medical staff bylaws of West Florida Hospital.
In accordance with its bylaws, West Florida Hospital issues a blank application for medical staff privileges to an applicant only after that applicant has provided documentation and information illustrating his or her eligibility for privileges. Only after that information is provided, and after West Florida Hospital verifies the eligibility of a potential applicant, will West Florida Hospital issue to the applicant a blank application for medical staff privileges— not before. An applicant’s failure to provide the required documentation will result in ineligibility to apply for staff membership or clinical privileges.[2]
Additionally, the medical staff bylaws of West Florida Hospital provide that an applicant for clinical privileges carries the burden of producing adequate information for a proper evaluation of his or her qualifications for clinical privileges, and that the credentialing committee has no obligation to review an application for medical staff privileges until it is fully completed. In conformity with the bylaws, an application is complete only after the hospital receives and verifies all information required under the application. Accordingly, West Florida Hospital will not consider a physician’s application for medical staff privileges — or the information provided therein — until after the application is completed and verified. Thereafter, West Florida Hospital submits the application to the particular department for which the applicant is seeking credentialing, and the department provides the credentialing committee with a copy of the application for its review.
Although West Florida Hospital disclosed a copy of its medical staff bylaws, it objected to the disclosure of the completed applications of Dr. Benson and Dr. Rees, as well as to the request that a blank application be produced. The hospital moved for a protective order with regard to those documents. West Florida Hospital contended that both the completed and blank applications were privileged because they related to peer review and fell within the statutory privileges provided in sections 395.0191, 395.0193, and 766.101, Florida Statutes.
In an amended motion for protective order, West Florida Hospital renewed its previous objections and further contended that the requested materials were not discoverable because the United States Congress preempted state law with regard to Amendment 7 by way of the Health Care Quality Improvement Act of 1986 (“HCQIA”). Specifically, West Florida Hospital alleged that Amendment 7 is unconstitutional because it conflicts with the *7 accomplishment and execution of the full purpose and objective of the HCQIA, which is to foster effective peer review.
West Florida Hospital next objected to all discovery requests made pursuant to Amendment 7 on the basis that Amendment 7, as interpreted by this Court in Florida Hospital Waterman, Inc. v. Buster, 984 So.2d 478 (Fla.2008), violates the Contract Clause of the United States Constitution. West Florida Hospital also contended that Buster supports the conclusion that Amendment 7 is unconstitutional because it violates the Due Process Clause of the Fourteenth Amendment because of the undue burden it places on litigants. Next, West Florida Hospital alleged that the discovery requests were overly broad under Amendment 7 in that the requests sought information that was privileged or confidential and beyond the scope of “adverse medical incidents” as that term is defined in Amendment 7.
West Florida Hospital also argued that the records See requested were attorney work-product and protected under section 395.0197(4), Florida Statutes (2006). More specifically, West Florida Hospital contended that in Buster, this Court did not invalidate section 381.028(7)(b)l — a subsection of the statute implementing Amendment 7 — leaving its constitutionality intact. West Florida Hospital interpreted that statute to mean that “adverse medical incidents” are those records identified in section 395.0197 that do not otherwise fall within the attorney work-product records protected under section 395.0197(4) or the common law. West Florida Hospital used this interpretation to draw the conclusion that “adverse medical incidents” are limited to incidents that are documented in Code 15 reports[3] and the annual report to Florida’s Agency for Health Care Administration (“AHCA”). West Florida Hospital alleged that the discovery request here was impermissible to the extent that it sought records beyond the Code 15 reports and the annual reports to the AHCA.
After a full hearing concerning West Florida Hospital’s requests for a protective order, the trial court issued two orders with regard to the discovery issues and West Florida Hospital’s objections to production and motion for a protective order. In the first order, the trial court found no preemption of Amendment 7 by the HCQIA, that Amendment 7 does not violate the Contracts Clause of the United States Constitution, and that Amendment 7 does not impose a broad or severe burden that violates the Due Process Clause of the Fourteenth Amendment. The first order also denied West Florida Hospital’s motion for a protective order as to documents that relate to “adverse medical incidents,” as defined in Amendment 7, of Dr. Benson and Dr. Rees for two years preceding the date of the surgery performed on See.
In the second order, the trial court granted in part and denied in part West Florida Hospital’s motion for protective order. It granted protection as to any completed initial and renewal applications for privileges submitted by Dr. Benson and Dr. Rees. The trial court denied the motion for protective order as to a blank application for medical staff privileges and any evidence of Dr. Benson’s and Dr. Rees’s surgical training for Roux-en-Y hepaticojejunostomy. The trial court also issued a protective order with regard to the credentialing files of Dr. Benson and Dr. Rees for matters other than “adverse medical incidents,” as those words are *8 defined in Amendment 7. No order was entered with regard to West Florida Hospital’s work-product objection and its arguments regarding the scope of section 381.028(7) (b)l.
West Florida Hospital filed an individual petition for writ of certiorari for each trial court order seeking review by the First District Court of Appeal. See W. Fla. Reg’l Med. Ctr. v. See, 18 So.3d 676, 682 (Fla. 1st DCA 2009). In those two petitions, West Florida Hospital challenged the parts of the orders that rejected its arguments and requests for protective relief. See id. The First District consolidated the petitions. See id.

The Decision of the First District

On review, the First District held that the trial court did not depart from the essential requirements of law in declining to adopt West Florida Hospital’s assertion that section 381.028(7)(b)l limits the records it must produce under Amendment 7 to only Code 15 reports and annual reports to the AHCA. See id. at 683. The First District held that if section 381.028(7)(b)l requires less production by hospitals than Amendment 7, that section conflicts with Amendment 7 and is unconstitutional. See id. at 683-84. The First District also affirmed the trial court’s rejection of West Florida Hospital’s claim that the HCQIA preempts Amendment 7. See id.
Further, the First District considered whether the trial court departed from the essential requirements of law in ordering West Florida Hospital to disclose a blank application for medical staff privileges. See id. at 690-91. It held that the information provided on the forms — not the blank forms themselves — is the confidential information considered by credentialing committees. See id. at 691.
ANALYSIS

Blank Application

In See, the First District below determined that section 766.101(5), Florida Statutes (2006), does not protect a blank application for medical staff privileges from disclosure during discovery. This created a direct conflict with Tenet Healthsystem Hospitals, Inc. v. Taitel, 855 So.2d 1257, 1258 (Fla. 4th DCA 2003). In Taitel, the Fourth District considered whether section 766.101(5), Florida Statutes (2002), protected the disclosure of a blank hospital form used by the hospital to review the competency of nurses. The Fourth District held that the broad confidentiality protections accorded by the language of section 766.101(5) included the blank hospital form and protected that form from disclosure.
We conclude that the First District in See correctly held that a blank application for medical staff privileges does not fall within the scope of confidentiality protections provided by sections 766.101(5) and 395.0191(8), Florida Statutes (2006), which are similar. Even if a blank application falls within the purview of sections 766.101(5) and 395.0191(8), Amendment 7 requires its disclosure. This case arose from an action against West Florida Hospital for the negligent grant of medical staff privileges to Dr. Benson and Dr. Rees.

Standard of Review and Principles of Law Coiiceming Statutory and Constitutional Interpretation

Statutory and constitutional construction are questions of law subject to a de novo review. See Zingale v. Powell, 885 So.2d 277, 280 (Fla.2004) (“[Cjonstitu-tional interpretation, like statutory interpretation, is performed de novo.”). The polestar of a statutory construction analysis is legislative intent. See Borden v. *9 East-European Ins. Co., 921 So.2d 587, 595 (Fla.2006). To discern legislative intent, this Court looks first to the plain and obvious meaning of the statute’s text, which a court may discern from a dictionary. See Rollins v. Pizzarelli, 761 So.2d 294, 297-98 (Fla.2000). If that language is clear and unambiguous and conveys a clear and definite meaning, this Court will apply that unequivocal meaning and not resort to the rules of statutory interpretation and construction. See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984). If, however, an ambiguity exists, this Court should look to the rules of statutory construction to help interpret legislative intent, which may include the examination of a statute’s legislative history and the purpose behind its enactment. See, e.g., Gulfstream Park Racing Ass’n v. Tampa Bay Downs, Inc., 948 So.2d 599, 606-07 (Fla.2006).
Similarly, when this Court construes a constitutional provision, it will follow construction principles that parallel those of statutory interpretation. See Ford v. Browning, 992 So.2d 132, 136 (Fla.2008) (quoting Zingale v. Powell, 885 So.2d 277, 282 (Fla.2004)). As with statutory construction, a question with regard to the meaning of a constitutional provision must begin with the examination of that provision’s explicit language. See id. If that language is “clear, unambiguous, and addresses the matter at issue,” it is enforced as written. Id. If, however, the provision’s language is ambiguous or does not address the exact issue, a court “must endeavor to construe the constitutional provision in a manner consistent with the intent of the framers and the voters.” Id.

Blank Application Not Protected Under Sections 766.101(5) and 395.0191(8)

Sections 766.101 and 395.0191 are applicable to the peer review and credentialing process of hospitals and health care entities. See Cruger v. Love, 599 So.2d 111, 112 (Fla.1992). These two statutes are very similar, with section 766.101 pertaining to peer review by a hospital medical review committee, and section 395.0191 pertaining to hospital staff membership privileges by a hospital licensing board. See §§ 766.101, 395.0191, Fla. Stat.
Section 766.101(5) states:
The investigations, proceedings, and records of a committee as described in the preceding subsections shall not be subject to discovery or introduction into evidence in any civil or administrative action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, or other actions of such committee or any members thereof. However, information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his or her knowledge, but the said witness cannot be asked about his or her testimony before such a committee or opinions formed by him or her as a result of said committee hearings.
Similarly, section 395.0191(8), provides:
The investigations, proceedings, and records of the board, or agent thereof with whom there is a specific written contract *10 for the purposes of this section, as described in this section shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of matters which are the subject of evaluation and review by such board, and no person who was in attendance at a meeting of such board or its agent shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such board or its agent or as to any findings, recommendations, evaluations, opinions, or other actions of such board or its agent or any members thereof. However, information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such board; nor should any person who testifies before such board or who is a member of such board be prevented from testifying as to matters within his or her knowledge, but such witness cannot be asked about his or her testimony before such a board or opinions formed by him or her as a result of such board hearings.
The Florida Legislature enacted these peer review statutes to encourage self-regulation by the medical profession through peer review and evaluation. See Cruger, 599 So.2d at 112-13 (citing Holly, 450 So.2d at 219-20). To foster peer review, the Legislature afforded discovery limitations in sections 766.101(5) and 395.0191(8), which provided confidentiality for the peer review process. See id. at 113 (citing Holly, 450 So.2d at 220).
In Cruger, this Court discussed the scope of the statutory privileges against discovery provided by sections 766.101(5) and 395.0191(8). Elois Cruger filed an action against Dr. Douglas Love on behalf of her son for the doctor’s alleged negligent treatment of her son’s fractured thumb. During the course of the action, Cruger sought from three local hospitals copies of Dr. Love’s applications for privileges at those hospitals and documents showing the hospitals’ delineation of privileges. The hospitals were not parties to the malpractice action. Dr. Love objected to the discovery request and claimed that the documents were excluded from discovery under sections 766.101 and 395.011, the predecessor to section 395.0191. The trial court ordered production of the documents, but the Fourth District reversed that order, holding that those statutory sections deemed those documents exempt from discovery.
This Court approved the decision of the Fourth District and held that sections 766.101 and 395.011 protected Dr. Love’s application, as well as any “document considered by the committee or board as part of its decision-making process.” Cruger, 599 So.2d at 114. This Court also held that policy should encourage full candor in the peer review process, and this policy is advanced if documents considered by the committee or board during the peer review or credentialing process are protected. See id. Individuals providing information to peer review bodies may fear reprisal and be reluctant to disclose all information if the documents were disclosed. See id.
This Court elaborated further on the scope of sections 766.101 and 395.0191 in Brandon Regional Hospital v. Murray, 957 So.2d 590 (Fla.2007). The issue before this Court in Brandon was whether a list generated by a hospital, which included a peer review committee recommendation that delineated the privileges given to a member of a hospital staff, was protected from discovery under sections 766.101 and *11 395.0191. That case involved a malpractice action against Brandon Regional Hospital for its alleged negligent failure to properly credential a doctor before he performed a surgical procedure, which resulted in an injury to a patient.
In our decision in Brandon, this Court noted that, historically, our interpretations of sections 766.101 and 395.0191 have erred on the side of protecting the confidentiality of the peer review process. See Brandon, 957 So.2d at 592. This Court held that, although the actual records of a credentialing committee involved in a peer review process may be excluded from discovery, a claimant in a medical malpractice case is entitled to discover a list of the privileges granted to a physician by a hospital. See id. at 591-95.
In this case, we conclude that the First District correctly disagreed with Taitel and held that a blank application for medical staff privileges is not confidential and protected from discovery under sections 766.101(5) and 395.0191(8). Although this Court has broadly interpreted the protections afforded under these statutory subsections, we conclude that the protections do not extend to West Florida Hospital’s blank application for medical staff privileges. That is because, as stated in Cruger, those statutory protections apply to “any document considered by the committee or board as part of its decision-making process.” Cruger, 599 So.2d at 114 (emphasis added). A blank application contains no information and, therefore, is not a document considered by a hospital in its decision-making process. Rather, it is only a completed application, which contains information necessary to the credentialing process, that is a document considered by a hospital in its decision-making process and, thus, falls within the protections afforded by sections 766.101(5) and 395.0191(8).
Furthermore, as provided by West Florida Hospital’s medical staff bylaws, the peer review and credentialing process does not even begin at the time a blank application is distributed. Instead, an application, once completed and verified, commences the peer review and credentialing process. A blank application is not a document that is part of West Florida Hospital’s peer review process.
We conclude that a blank application for medical staff privileges does not fall within sections 766.101(5) and 395.0191(8). Accordingly, the First District correctly held that West Florida Hospital’s blank application form is not privileged from disclosure under those statutory subsections.

Amendment 7 Requires the Disclosure of the Blank Application

Even if a blank application were considered to be within the parameters of sections 766.101(5) and 395.0191(8), we conclude that Amendment 7 nonetheless mandates its disclosure because, in See’s action for negligent grant of medical staff privileges, the blank application is a record of an adverse medical incident. It is the blank form upon which the information was placed to generate the record of the medical staff application process and procedure that led to the alleged negligent grant of medical staff privileges to Dr. Benson and Dr. Rees, which led to the injury inflicted on See.
As passed by the voters of Florida, Amendment 7 states:
SECTION 25. Patients’ right to know about adverse medical incidents.—
(a) In addition to any other similar rights provided herein or by general law, patients have a right to have access to any records made or received in the *12 course of business by a health care facility or provider relating to any adverse medical incident.
(b) In providing such access, the identity of patients involved in the incidents shall not be disclosed, and any privacy restrictions imposed by federal law shall be maintained.
(c) For purposes of this section, the following terms have the following meanings:
(1) The phrases “health care facility” and “health care provider” have the meaning given in general law related to a patient’s rights and responsibilities.
(2) The term “patient” means an individual who has sought, is seeking, is undergoing, or has undergone care or treatment in a health care facility or by a health care provider.
(3) The phrase “adverse medical incident” means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.
(4) The phrase “have access to any records” means, in addition to any other procedure for producing such records provided by general law, making the records available for inspection and copying upon formal or informal request by the patient or a representative of the patient, provided that current records which have been made publicly available by publication or on the Internet may be “provided” by reference to the location at which the records are publicly available.
Art. X, § 25, Fla. Const, (emphasis added).
The purpose of this amendment, as set forth by its ballot summary, is “to give patients the right to review, upon request, records of health care facilities’ or providers’ adverse medical incidents, including those which could cause injury or death.” Advisory Op. to the Att’y Gen. re Patients’ Right to Know About Adverse Med. Incidents, 880 So.2d 617, 619 (Fla.2004) (quoting Amendment 7’s ballot summary).
In Florida Hospital Waterman v. Buster, 984 So.2d 478 (Fla.2008), this Court implicitly determined that sections 395.0191(8) and 766.101(5) do not constrain the application of Amendment 7. More specifically, in Buster, this Court addressed whether Amendment 7’s disclosure requirements applied retroactively to documents that were otherwise protected from discovery under sections 395.0191(8) and 766.101(5). This Court posited that the text of the ballot and its summary reflected a desire to discard the existing restrictions on a patient’s right to access a medical provider’s history of adverse medical incidents “and to provide a clear path to access those records” without legal barriers. Id. at 489. After this Court determined that the Legislature did not delineate substantive rights in sections 395.0191 and 766.101, and that Amendment 7 applied retroactively, it held that Amendment 7 grants patients access to “existing histories of adverse medical incidents,” id. at 492, including those records that otherwise fell within the purview of sections 395.0191 and 766.101.
In this case, which arises from a cause of action for negligent grant of medical staff privileges, West Florida Hospital’s blank application for medical staff privileges falls within the ambit of Amendment *13 7 and is subject to disclosure. This is consistent with the plain language of Amendment 7, which requires that patients have access to “adverse medical incidents.” Amendment 7’s definition of “adverse medical incidents” includes “medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury or death of a patient.” (Emphasis added.) Part of the conduct, or act by West Florida Hospital, that led to the alleged negligent grant of staff privileges to Dr. Benson and Dr. Rees are the questions that the hospital posed on its application for medical staff privileges. More specifically, if the questions asked by West Florida Hospital on its application for medical staff privileges failed to lead to a proper inquiry into the qualifications of Dr. Benson and Dr. Rees, which in turn led to the grant of privileges to these possibly unqualified physicians, that application is a record of, and evidence pertaining to, West Florida Hospital’s potential negligent conduct, or act, of granting those staff privileges, which purportedly resulted in the injury to See.
Therefore, the express wording of Amendment 7 compels a conclusion that the blank application, and the information provided therein — i.e., the types of questions asked, which indicate the process by which West Florida Hospital grants medical staff privileges — is a record of an adverse medical incident and subject to disclosure.

Section 381.028(7)(b)l, Florida Statutes

West Florida Hospital next alleges that the First District erred when it failed to hold that the trial court acted improperly when it did not delineate a process by which discovery is constitutionally conducted under Amendment 7, and that it erred when it failed to hold that the trial court departed from essential requirements of law in its conclusion that section 381.028(7)(b)l, Florida Statutes (2006), does not limit discovery under Amendment 7. We affirm the decision of the First District because (1) West Florida Hospital failed to raise its argument with regard to the propriety of the process for disclosure of materials under Amendment 7 before the trial court, and, as a result, failed to preserve the issue for review; and (2) section 381.028(7)(b)l impermissibly attempts to limit the application of the discovery requirements under Amendment 7.
West Florida Hospital did not preserve its argument that the trial court failed to provide a constitutional process for procurement of documents under Amendment 7 because it failed to argue to the trial court that the court was required to delineate the process by which a party is to conduct discovery under Amendment 7. See Castor v. State, 365 So.2d 701, 703 (Fla.1978) (“As a general matter, a reviewing court will not consider points raised for the first time on appeal.”). Rather, before the trial court, West Florida Hospital alleged that section 381.028(7)(b)l limits discovery under Amendment 7 to only incident reports defined in sections 395.0197(5) and (7).
The First District, however, correctly concluded that the trial court did not depart from the essential requirements when it declined to limit the scope of Amendment 7 by application of section 381.028(7)(b)l. The Florida Legislature enacted section 381.028, Florida Statutes, to address Amendment 7. Amendment 7 provides that a patient has the right to access “any records” that relate to “adverse medical incidents,” which
means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or *14 could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.
(Emphasis added.)
Subsection 381.028(7)(b)l provides: “Using the process provided in s. 395.0197, the health care facility shall be responsible for identifying records as records of an adverse medical incident, as defined in s. 25, Art. X of the State Constitution.” Section 395.0197 requires hospitals to maintain an “internal risk management program,” which addresses maintenance of hospital records of adverse medical incidents. See § 395.0197(1). Among the required records are Code 15 reports and annual reports to the ANCA, which are reports that concern adverse incidents listed in section 395.0197, subsections (5) and (7). See § 395.0197(5), (7). Section 395.0197, subsections (5) and (7) limit the definition of “adverse incidents” to specific occurrences that involve severe injuries. See id.
In Buster, this Court addressed the constitutionality of section 381.028. The Court held that, although Amendment 7 is self-executing and does not require legislative enactment, “the Legislature is still free to give force and effect to its provisions so long as it does not run afoul of the rights granted in the constitution.” Buster, 984 So.2d at 492 (emphasis added). This Court then invalidated as unconstitutional section 381.028, subsections (3)(j) and (5)-(7)(a), because they contravened the broad rights of access to adverse medical incident reports granted by Amendment 7. See id. at 492-94. We also held that, even though the statute does not contain a severability clause, the unconstitutional portions were severable and its constitutional subsections remained in force. See id. at 493. The provisions that remained in force were the remainder of subsection (3) along with subsections (4) and (7)(b), which provided definitions, dictated that patient privacy restrictions be upheld, and identified, under other statutes, the party responsible for identifying records of adverse medical incidents. See id. This Court also upheld section 381.028(7)(c), which provided that the cost of fees for the production of records shall not exceed the reasonable cost of complying with the request, and that requests shall be processed in a timely manner. See id. (citing § 381.028(7)(c)).
The Fourth District, in deciding whether section 381.028(7)(b)l was constitutional as applied to Amendment 7, applied Buster in Columbia Hospital Corp. of South Broward v. Fain, 16 So.3d 236, 241 (Fla. 4th DCA 2009). It held:
Columbia also argues that language in section 381.028(7)(b)l limits the types of records that it may be required to produce and provides the sole method through which the hospital must identify records of adverse medical incidents. Columbia’s argument that pursuant to this statute it must provide only certain reports (“Code 15” reports under section 395.0197) is expressly contrary to the amendment. The amendment provides that it is “not limited to ” incidents that already must be reported under law. Art. X. § 25(c)(3), Fla. Const, (emphasis supplied). As the Florida Supreme Court held in Buster, the legislature may not limit the scope of discoverability of adverse incident reports in a manner inconsistent with the amendment. *15 Columbia’s argument calls for an unconstitutional application of the statute.

Id.

As in Fain, the First District in this case did not err because section 381.028(7)(b)l — through the application of section 395.0197 — impermissibly attempts to limit discovery under Amendment 7. More specifically, Amendment 7 provides that patients shall have access to records of adverse incidents, including those records “reported to or reviewed by any health care facility ... risk management ” committee. (Emphasis added.) Section 381.028(7)(b)l, however, attempts to limit disclosure of matters to those incidents found in reports under section 395.0197(5) and (7). This conflicts with Amendment 7’s definition of adverse medical incidents, which does not place a boundary on matters to be disclosed to patients. Hence, section 381.028(7)(b)l runs afoul of the discovery permitted under Amendment 7. Accordingly, the First District correctly held that the trial court did not depart from the essential requirements of law when it declined to limit the scope of Amendment 7 through application of section 381.028(7)(b)l.
In addition, even if West Florida Hospital preserved its argument concerning the procedure for the disclosure of records under section 381.028, we hold that the process provided under that statute is constitutional. This is in accord with our decision in Buster, where this Court held that section 381.028’s procedures for disclosure of materials discoverable under Amendment 7 were constitutional, as they did not conflict with the requirements of disclosure under Amendment 7. See Buster, 984 So.2d at 493 (holding constitutional section 381.028’s provision that “fees for the production of records cannot exceed the reasonable cost of complying with the request and that requests for production must be processed in a timely manner” (citing § 381.028(7)(c))).

Federal Preemption

West Florida Hospital next argues that the HCQIA preempts Amendment 7 upon application of implied conflict preemption because Amendment 7’s disclosure requirements thwart the intended purpose of effective peer review under the HCQIA. Amendment 7 requires disclosure of reports of adverse medical incidents to patients that request them, even if those reports are made during the peer review process. After examining the purpose of the HCQIA and the law concerning federal preemption, we conclude that the HCQIA does not preempt Amendment 7 because (1) the purposes of the HCQIA and Amendment 7 are achieved without conflict; and (2) Congress, through the express language of the HCQIA, clearly demonstrated an intent that state law is not preempted by the HCQIA.

Conflict Preemption

Under the Supremacy Clause of the U.S. Constitution, a federal law may preempt state law. See State v. Harden, 938 So.2d 480, 485-86 (Fla.2006). Preemption occurs when Congress intentionally enacts legislation that is intended to supersede state law on the same subject. See id. at 486 (“A state cannot assert jurisdiction where Congress clearly intended to preempt a field of law.” (citing Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981))). There are three forms of preemption recognized by the U.S. Supreme Court, which includes express preemption, implied field preemption, and implied conflict preemption. See id. Express preemption exists where a federal statute explicitly preempts state law. See id. Implied field preemption is only applicable “where the scheme of fed *16 eral regulation is ‘so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.’ ” Id. (quoting Gade v. Nat’l Solid Wastes Mgmt. Assn., 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). Implied conflict preemption occurs only when it is physically impossible to simultaneously comply with both federal and state law on a topic, or where state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Id. (quoting Gade, 505 U.S. at 98, 112 S.Ct. 2374). At issue in this appeal is whether the HCQIA preempts Amendment 7 through implied conflict preemption because there is no express statement of preemption of state law in the HCQIA and the HCQIA is not so pervasive and exclusive as to control the entire subject. See See, 18 So.3d at 684.
The ultimate touchstone in every preemption case is the purpose of Congress. See Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)). In preemption cases, we begin with a presumption against preemption, unless preemption has been expressed in the clear and manifest purpose of Congress. See id. Hence, our ultimate task in this implied preemption case is to determine whether the structure and purpose of the state law is consistent with the federal statute as a whole. See Harden, 938 So.2d at 486 (quoting Gade, 505 U.S. at 98, 112 S.Ct. 2374). To make this determination, we must look to the provisions of the law at issue, as well as to the objectives and policy of the law. See id. This involves an examination of the text and the history of both the state and federal laws involved. See id. at 485 (“In resolving this issue, we begin by reviewing the basic principles of preemption and then we examine the history and language of both the federal and state statutes.”); see also Wyeth, 555 U.S. at 566, 129 S.Ct. 1187 (“In order to identify the ‘purpose of Congress,’ it is appropriate to briefly review the history of federal regulation of drugs and drug labeling.”). Our review also involves the examination of the power that Congress exerted, the objective that Congress sought, and the nature of the obligations it imposed by law. See Harden, 938 So.2d at 486 (quoting Hines v. Davidowitz, 312 U.S. 52, 70, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). Furthermore, indicative of Congress’s intent not to preempt state law is silence on an issue, as well as a federal savings clause that preserves state law. See Wyeth, 555 U.S. at 567, 574-76, 129 S.Ct. 1187.
For example, in Wyeth, the U.S. Supreme Court decided whether Congress intended to preempt Vermont tort law by federal regulation regarding drug labels adopted by the Food and Drug Administration (“FDA”) under the Food, Drug, and Cosmetic Act (“FDCA”). That case arose from an action for common-law negligence and strict liability filed by Diana Levine against Wyeth, a corporate manufacturer of drug products. Levine filed an action after she suffered an injury allegedly caused by an injection of a drug produced by Wyeth. Levine based her cause of action on Wyeth’s purported failure to adequately label a drug with a warning label that denoted the drug’s dangers.
The High Court decided that Congress did not expressly preempt state law through the FDCA because the text of the law did not provide the congressional intent to preempt state law. The Supreme Court concluded that if Congress perceived state-law suits to be an obstacle to the objectives of the FDCA, it would have enacted an express preemption provision in the FDCA at some point. See Wyeth, 129 S.Ct. at 1200. The High Court also *17 concluded that Congressional silence on the issue, along with its knowledge of state tort litigation principles, served as evidence that Congress did not intend for the FDCA to be the exclusive means to ensure drug safety and effectiveness. See id. Further, the High Court held that it was possible for Wyeth to comply with both state and federal obligations, and that Levine’s state common-law claims did not stand as an obstacle to the accomplishment of the purposes in enacting the FDCA. Based on these determinations, the High Court concluded that the FDCA did not preempt Vermont tort law by implied conflict preemption.
Similarly, in Columbia Hospital Corp. of South Broward v. Fain, 16 So.3d 236 (Fla. 4th DCA 2009), the Fourth District Court of Appeal addressed whether the HCQIA preempted Amendment 7 through implied conflict preemption. There, Columbia Hospital sought review of a trial court order that rejected Columbia Hospital’s objections to discovery by plaintiff Rebecca Fain. The underlying action arose when William Fain fell from a hospital bed and died. During litigation, the estate requested incident reports for William’s fall and for all adverse medical incident reports issued in the previous five years involving patient falls. The trial court rejected the hospital’s objections to discovery.
The hospital argued that the HCQIA preempted Amendment 7 through implied conflict preemption. The Fourth District, however, concluded that the HCQIA did not conflict with Amendment 7 and, therefore, did not preempt Amendment 7. See id. at 241-43. The HCQIA accomplishes its goal of effective peer review by immunizing peer review bodies and those providing information in such proceedings from civil damages — not by making peer review materials confidential and privileged from discovery. See id. The Fourth District held that Amendment 7 did not conflict with the HCQIA’s purpose because it did not interfere with the immunity provided by the HCQIA; rather, it required disclosure of reports of adverse medical incidents, even if the peer review bodies gathered those reports during the peer review process. See id. To further bolster its conclusion of non-preemption, the district court relied upon the savings clause in the HCQIA, which provides that nothing in the HCQIA “shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law.” 42 U.S.C. § 11115(a) (2006). Based on this provision, the Fourth District held that Congress clearly intended not to preempt state law with regard to confidentiality or discovery of peer review documents. See Fain, 16 So.3d at 241-13.
The First District in See adopted the reasoning in Fain. The First District also held that Congress reflected its intent that state law not be preempted by remaining silent in the HCQIA on the issue of confidentiality of peer review documents, i.e., if Congress had intended for the HCQIA to provide confidentiality for such documents, it would have expressly legislated for such confidentiality.
The legislative history of the HCQIA also supported this conclusion. After examining a report of the U.S. House of Representatives concerning the HCQIA, the First District held that the language of that report illustrated that Congress carefully considered the need for effective peer review, and that it addressed that need by providing immunity for those who participated in peer review — not by providing confidentiality of documents produced during the peer review process. The First District concluded:
*18 If Congress had found a peer review privilege necessary to the effectiveness of peer review processes, it would have included such a privilege in the HCQIA. Because Petitioner has not shown that effective peer review is impossible without the confidentiality of peer review materials, we agree with the trial court’s ruling that the HCQIA does not preempt Amendment 7. Accordingly, we deny the petition as to this ruling.
See, 18 So.3d at 687.

Health Care Quality Improvement Act of 1986

Congress adopted the HCQIA to address “a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician’s damaging or incompetent performance.” 42 U.S.C. § 11101(2) (2006). The HCQIA is intended to promote “effective professional peer review” in an effort to remedy this nationwide problem. Id. § 11101(3). To promote effective peer review, Congress did consider issues with regard to civil liability for those involved in the peer review process. See id. § 11101(4). Congress believed that such possible liability may discourage physicians from participating in effective professional peer review. See id. The HCQIA was intended to address the need to provide incentives and liability protection for physicians engaging in the process of professional peer review. See id. § 11101(5).
Under the HCQIA, any health care facility that takes peer review action that (1) adversely affects the clinical privileges of a physician for longer than thirty days, (2) accepts the surrender of clinical privileges of a physician, or (3) adversely affects the membership of a physician in a professional society, must report that action to National Practitioner Data Bank (“NPDB”). See 42 U.S.C. § 11133(a) (2006). Health care facilities are required to consult the NPDB to determine if any reports have been filed concerning a new physician. See id. § 11135(a). For existing physicians, health care facilities must consult the NPDB for reports once every two years. See id.
As an incentive for this peer review, the HCQIA provides immunity from “damages under any law of the United States or of any State” to a peer review body and those reporting to it. Id. § 11111(a)(2); see also H.R.Rep. No. 99-903, at 8 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6391 (“Subsection (a) provides limited, but essential, protection from liability for persons conducting professional review actions based on the competence or professional conduct of individual physicians.”). That immunity extends to causes of action arising from information reported to a peer review body regarding the “competence or professional conduct of a physician,” unless the information provided is false and the person who disclosed it knew of its falsity. Id. § 11111(a)(2); see also H.R.Rep. No. 99-903, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6391 (“Subsection (a) also provides immunity for persons providing information to professional review bodies, unless the information is false and the person providing the information actually knows it is false.”). The purpose of the immunity provision is to ensure physician and health care facility cooperation with the reporting system imposed by the HCQIA. See H.R.Rep. No. 99-903, at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6385 (“To assure that the medical profession cooperates in this system, the Committee believes it is essential to provide some legal immunity to doctors and hospitals that engage in peer review activities.” (emphasis added)).
*19 The HCQIA, however, does not in any way provide for confidentiality of peer review records or communications — it provides only immunity for those who provide information to peer review bodies and may subsequently face civil action due to that participation. See Fain, 16 So.3d at 242 (“The [HCQIA] provides ‘protection’ encouraging effective peer review by immunizing peer review bodies and those providing information during such proceedings from damages in a civil suit.” (citing § 11111)); Cf. H.R.Rep. No. 99-903, at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6391 (“Initially, the Committee considered establishing a very broad protection from suit for professional review actions.... As redrafted, the bill now provides protection only from damages in private actions, and only for proper peer review, as defined in the bill.”).
With regard to confidentiality of matters discussed in the peer review process, Congress expressed the following in the HCQIA:
Information reported under this sub-chapter is considered confidential and shall not be disclosed (other than to the physician or practitioner involved) except with respect to professional review activity, as necessary to carry out subsections (b) and (c) of section 11135 of this title (as specified in regulations by the Secretary), or in accordance with regulations of the Secretary promulgated pursuant to subsection (a) of this section. Nothing in this subsection shall prevent the disclosure of such information by a party ivhich is otherwise authorized, under applicable State law, to make such disclosure.
42 U.S.C. § 11137(b)(1).
Congress also enacted the following provisions within the HCQIA concerning the HCQIA’s construction and application:
Except as specifically provided in this subchapter, nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this subchapter.
Id. § 11115(a) (emphasis added); see also H.R.Rep. No. 99-903, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6395 (“Subsection (a) clarifies that where or to the extent that this legislation does not apply, all other applicable law does apply.”).
Congress then stated:
Nothing in this chapter shall be construed as affecting in any manner the rights and remedies afforded patients under any provision of Federal or State law to seek redress for any harm or injury suffered as a result of negligent treatment or care by any physician, health care practitioner, or health care entity, or as limiting any defenses or immunities available to any physician, health care practitioner, or health care entity.
42 U.S.C. § 11115(d) (emphasis added).
In Johnson v. Nyack Hospital, 169 F.R.D. 550 (S.D.N.Y.1996), the court addressed whether Congress intended to provide a privilege that protected the confidentiality of peer review materials in the HCQIA. The federal court held that although the HCQIA provided “qualified immunity from suit to officials who conduct peer reviews that meet the standards outlined in the statute,” it concluded that the HCQIA did not establish a privilege for most documents created in the peer review process. Johnson, 169 F.R.D. at 560. The district court held that Congress, in enacting the HCQIA
*20 not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting confidentiality with other important interests. Congress spoke loudly with its silence in not including a privilege against discovery of peer review materials in the HCQIA.
Id. (emphasis added) (quoting Teasdale v. Mann Gen. Hosp., 138 F.R.D. 691, 694 (N.D.Cal.1991)).

The HCQIA Does Not Preempt Amendment 7

The HCQIA does not preempt Amendment 7 through implied conflict preemption because the objectives and purposes of each do not conflict. The overarching purpose of the HCQIA is to promote effective peer review. To achieve the HCQIA’s purpose of effective peer review, Congress expressly provided only immunity to those who participated in the peer review process for matters reported during peer review. The HCQIA clearly does not provide for confidentiality for peer review documents. By contrast, the purpose of Amendment 7 is to require disclosure of reports concerning adverse medical incidents involving a physician— not to deprive physicians of immunity in the peer review process.
A physician may enjoy immunity from suit under the HCQIA for matters disclosed in the peer review process, even though relevant reports concerning adverse medical incidents may be disclosed, and even if those reports relate to matters discussed during peer review. A physician’s immunity from civil action based upon conduct during the peer review process is in no way contingent or dependent upon confidentiality of all matters discussed within that process. The HCQIA simply does not preempt Amendment 7 through implied conflict preemption, as the two do not conflict because they both achieve their intended purposes without infringing upon one another.
Furthermore, the express language of the HCQIA reveals the intent of Congress to not preempt state law. The language of the HCQIA provides three savings clauses, one of which applies directly to the non-confidentiality of matters disclosed in the peer review process. Section 11137(b)(1) delineates the savings clause with regard to confidentiality, expressly providing that nothing in the HCQIA “shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclosure.” (Emphasis added.) Amendment 7 is state law that explicitly requires the disclosure of “adverse medical incidents,” even if those matters are discussed during the peer review process. The amendment includes in the definition of an “adverse medical incident” those “incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee.” (Emphasis added.) Therefore, Congress, in preserving state law with regard to the disclosure of information, specifically expressed its intent to not preempt any state law such as Amendment 7 in the HCQIA.
A second savings clause in the HCQIA provides that the HCQIA shall not be construed as “preempting or overriding any State law” unless that law provides a lesser degree of immunity than the HCQIA. See § 11115(a). A third savings clause provides that nothing in the HCQIA “shall be construed as affecting in any manner the rights and remedies afforded patients under any provision of Federal or State law.” Id. § 11115(d). These provisions reflect the intent of Congress to preserve any state law that does not provide less *21 immunity from suit than the HCQIA, which includes laws requiring disclosure of matters discussed during peer review. As previously discussed, such state laws do not involve immunity from a civil action concerning matters arising during the peer review process. This finding is supported by a report of the U.S. House of Representatives, which found that “where or to the extent that [the HCQIA] does not apply, all other applicable law does apply.” H.R. Rep. No. 99-903, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 6384, 6395 (emphasis added).
The HCQIA’s silence as to the existence of a confidentiality privilege also reflects the intent of Congress to not provide that type of confidentiality privilege for peer review materials in the HCQIA. As discussed in Johnson, Congress considered maintaining confidentiality of the peer review process, as well as other competing interests. Congress decided to not provide confidentiality of peer review documents, but rather, provided those who participated in the peer review process with immunity from suit. Accordingly, Congress spoke loudly with its silence when it did not include confidentiality or a privilege against disclosure of peer review materials in the HCQIA.
We conclude that Congress did not intend for the HCQIA to prevent or preclude the disclosure of peer review materials. The HCQIA does not conflict with the disclosure requirements of Amendment 7 and it does not preempt Amendment 7.
CONCLUSION
We approve the First District’s decision below in See because the First District held that the trial court correctly ordered the disclosure of a blank application for medical staff privileges. Section 381.0287(b)l impermissibly attempts to limit the disclosure requirements of Amendment 7, and the HCQIA does not preempt Amendment 7. In accordance with our decision, we disapprove the decision of the Fourth District in Taitel and its contrary holding that a blank form used by a hospital for nurse credentialing is confidential and protected fi-om disclosure.
It is so ordered.
PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., and POLSTON, J„ concur in result only.

. Article X, section 25 was added to the Florida Constitution by voters during the November 2, 2004 election. See Fla. Hosp. Waterman, Inc. v. Buster, 984 So.2d 478, 480 (Fla.2008). It is referred to as "Amendment 7” because it was the seventh amendment to the Florida Constitution proposed on the November 2004 ballot. See id. at 480 n. 1 (citing Fla. Dep't of State, Div. of Elections, Nov. 2, 2004, General Election, Official Results, http://election.dos.state.fl.us/elections/ resultsarchive/ (last visited Jan. 9, 2012)). Floridians for Patient Protection sponsored that amendment and entitled it "Patients’ Right to Know About Adverse Medical Incidents.” See id. Amendment 7 passed with a vote of 81.2 percent in favor of it and 18.8 percent against it. See id.

. As provided in West Florida Hospital's medical staff bylaws:
If the individual is able to provide the above listed evidence of qualifications, he/she shall be provided with an application form. Failure to provide the above listed evidence shall result in ineligibility to apply for Staff membership or clinical privileges and shall not be considered an adverse action, and the individual shall not be entitled to any hearing or appeal rights under these Bylaws. Such determination will not result in the filing of a report with the state professional licensing board or with the National Practitioner Data Bank.
(Emphasis supplied.)

. A Code 15 report is a report that a health care facility must file with Florida's Agency for Health Care Administration within fifteen calendar days after the occurrence of an "adverse incident” as defined in section 395.0197(7).