# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D17-2174

_____

STATE OF FLORIDA, DEPARTMENT
OF HEALTH,

    Appellant,

    v.

BAYFRONT HMA MEDICAL
CENTER, LLC d/b/a BAYFRONT
HEALTH - ST. PETERSBURG, and
GALENCARE, INC. d/b/a
NORTHSIDE HOSPITAL,

    Appellees.

_____

No. 1D17-2229

_____

GALENCARE, INC. d/b/a
NORTHSIDE HOSPITAL,

    Appellant,

    v.

BAYFRONT HMA MEDICAL
CENTER, LLC d/b/a BAYFRONT
HEALTH-ST. PETERSBURG,

    Appellee.

_____

On appeal from the Circuit Court for Leon County.
Karen A. Gievers, Judge.

January 2, 2018


LEWIS, J.

In these consolidated appeals, Appellants, the Department of Health (Department) and Galencare, Inc. d/b/a Northside Hospital (Northside), appeal a non-final order enjoining Northside from operating a provisional trauma center and enjoining the Department from allowing Northside to operate one prior to the conclusion of any timely-filed administrative proceeding challenging any preliminary approval of Northside's application and any judicial review. Appellants raise two issues on appeal, only one of which merits discussion. Appellants argue, and we agree, that the trial court erred by granting the motion for temporary injunction filed by Appellee, Bayfront HMA Medical Center, LLC d/b/a Bayfront Health - St. Petersburg (Bayfront), because Bayfront failed to prove its entitlement to temporary injunctive relief. Therefore, we reverse and remand.

**FACTUAL AND PROCEDURAL BACKGROUND**

Bayfront operates a level II trauma center in Trauma Service Area ("TSA") 9. On September 30, 2016, Northside submitted to the Department a letter of intent ("LOI") to apply for approval to operate a new trauma center in TSA 9. On October 14, 2016, the Department accepted Northside's LOI and responded with instructions on how to submit a trauma center application by the April 3, 2017, deadline.

On March 10, 2017, Bayfront filed against Appellants a Complaint for Injunctive and Declaratory Relief, arguing that the Department lacks colorable authority to (1) accept a LOI and application from Northside because TSA 9 currently does not have a trauma center position available given that Florida Administrative Code Rule 64J-2.010 provides for two positions in that TSA and both are filled and (2) allow a provisional trauma center to operate during the pendency of an administrative

2

challenge to the provisional approval of the application. In Count 1, Bayfront asked that the Department be enjoined from accepting and processing Northside's LOI and application and from allowing Northside to begin provisionally operating prior to the conclusion of any timely-filed administrative proceeding challenging any preliminary approval, and also asked that Northside be enjoined from operating as a provisional trauma center in TSA 9 until the conclusion of any administrative challenge. In Count 2, Bayfront sought a declaratory judgement.

On March 24, 2017, Bayfront filed a Motion for Temporary Injunction, seeking to enjoin the Department from permitting Northside to begin operating as a provisional trauma center, and seeking to enjoin Northside from operating as a provisional trauma center, prior to the conclusion of all timely-filed administrative challenges. On or around March 31, 2017, Northside submitted to the Department an application to operate a trauma center in TSA 9. The parties stipulated that the Department would permit Northside to begin operating on May 1, 2017, if its application met the programmatic requirements upon the Department's review.

At the April 5, 2017, evidentiary hearing on Bayfront's motion, Kathryn Gillette, the market president and CEO of Bayfront, testified that Bayfront tracks the zip codes of its patients and conservatively estimates, after having made some assumptions, that it would lose 905 of its 2,725 patients and $4.5 million annually if Northside's trauma center were to open. Gillette was aware of only one emergency room nurse leaving Bayfront for Northside and was not aware of any physicians leaving. Gillette further testified that despite two trauma centers opening in the vicinity, Bayfront has maintained a quality program and sufficient patient volume. Gillette agreed that the Department's action of receiving and reviewing Northside's application does not pose any harm and there is no adverse impact until the Department approves the application.

Dr. Steven Epstein, a trauma surgeon and the trauma medical director at Bayfront, testified that he believes if Northside opened a trauma center, Bayfront would lose half or more of its patients and there would be nothing to do to regain its patient volume,

3

which in turn would have a financial impact on Bayfront and would endanger the trauma staff's skills. When Bayfront sought to prevent Regional Medical Center Bayonet Point, the other trauma center serving TSA 9, from being approved, Epstein was of the view in those legal proceedings that Bayonet's opening would have the same kind of impact he now believes Northside's opening will have. Epstein testified that Bayfront continues to provide high quality care that was not diminished by the opening of the two trauma centers in the vicinity, but opined that the opening of those trauma centers is not comparable to Northside because they are located farther away. Epstein added that even those openings resulted in a loss of patients to Bayfront, but Bayfront was able to recover its patient volume after working with EMS to revise the transport protocols. Epstein further testified that "nobody will be leaving Bayfront to go to Northside" because employees are bound by non-compete clauses and do not wish to leave, although trauma surgeons expressed a potential desire to leave if they cannot maintain their skills.

Cindy Dick testified on the Department's behalf that according to the Department's 2016 assessment of the statewide trauma system, 36.35% of severely injured patients in TSA 9 did not receive care in a trauma center. Dick explained that the Department may review and provisionally grant an application irrespective of the availability of a trauma center slot in the TSA and the Department is not authorized to refuse to process Northside's application or to prevent Northside from beginning provisional operation on May 1st if its application is found acceptable. During litigations over the years, there has been much discussion about the quality of care declining at existing trauma centers as a result of new trauma centers opening nearby, but the Department has not received any evidence indicating that to be the case; to the contrary, experts have testified that their quality of care did not diminish upon the opening of new trauma centers in their area.

Peter Kennedy, the chief operating officer at Northside, testified that in order to comply with the Department's application requirements, Northside hired trauma staff, acquired proper equipment, renovated its emergency room, and implemented over 200 protocols and thousands of training hours; in doing so, it

4

incurred about $4 million in start-up costs. Kennedy testified that none of Northside's thirty-two-plus non-physician and five or six physician hirees were Bayfront employees.

Dr. Erik Barquist, a trauma surgeon and the interim trauma medical director at Northside, testified that Northside has hired the requisite trauma surgeons, and the literature does not indicate what happens to a trauma center's quality of care when its patient volume decreases due to a new competitor. Barquist opined that Bayfront presented the worst case scenario in estimating its losses and given its standing and experience in the community, it will find a way to work with EMS to mitigate the decrease in its patient volume. In every Florida case that Barquist was aware of, existing trauma centers were concerned about and challenged new trauma centers, yet continued to operate, and he was not aware of there being a diminution in quality at any existing trauma center.

In April 2017, the trial court entered an Order Enjoining Appellants, wherein it ordered that pending further order of the court, Northside is prohibited from operating a provisional trauma center in TSA 9, and pending further order of the court and the opening of a trauma center slot in TSA 9, the Department is enjoined from permitting Northside to operate a provisional trauma center until the completion of the administrative proceedings relating to Northside's application and any judicial review. The trial court found in part that the evidence and controlling law provide a substantial certainty that Bayfront will prevail on the merits of its claim because the Department planned to require Northside to begin the provisional operation of a trauma center on May 1, 2017, even though the law precludes provisional licensees from beginning to provide trauma services if there is not an open slot in the TSA and even though there was no final agency action. The trial court further found that Bayfront established that it will be irreparably harmed by Northside's immediate trauma operations on May 1st upon the approval of its application and that those irreparable harms include economic harm due to the dilution of trauma patients, increased difficulty in hiring qualified trauma staff due to competition, increased difficulty in maintaining qualified trauma staff due to the decrease in trauma patient volume, and decreased quality of trauma care.

By letter dated May 1, 2017, the Department informed Northside that it had completed the provisional review of its application and denied the application upon determining it did not meet the standards of critical elements for provisional status. These appeals followed.

## STATUTORY FRAMEWORK AND THE TRAUMA CENTER APPLICATION PROCESS

We begin with a brief overview of the statutory and regulatory framework governing trauma centers. The Florida Legislature has found it necessary to establish an inclusive trauma system "designed to meet the needs of all injured trauma victims who require care in an acute-care setting." § 395.40(2), Fla. Stat. (2016). To that end, the Legislature "place[s] primary responsibility for the planning and establishment of a statewide inclusive trauma system with the department" and requires the Department to update the state's trauma system plan at least annually. § 395.40(3)-(6), Fla. Stat.; *see also* § 395.402(3), Fla. Stat. (2016) (directing the Department to consider various factors in its annual review of the trauma system, including "[t]he geographical composition of an area to ensure rapid access to trauma care by patients," "[p]opulation growth characteristics," and "[t]he actual number of trauma victims currently being served by each trauma center"). The Legislature has established nineteen TSAs, with TSA 9 consisting of Pasco and Pinellas Counties, and has provided that each TSA should have at least one Level I or Level II trauma center, "[t]he department shall allocate, by rule, the number of trauma centers needed for each trauma service area," and "[t]here shall be no more than a total of 44 trauma centers in the state." § 395.402(4), Fla. Stat. Florida Administrative Code Rule 64J-2.010 sets forth the criteria to be used in allocating trauma centers among the TSAs and allocates two trauma centers for TSA 9.

Section 395.4025, Florida Statutes (2016), governs the trauma center application and selection process. First, the Department "shall annually notify each acute care general hospital . . . that the department is accepting letters of intent from hospitals that are interested in becoming trauma centers." § 395.4025(2)(a), Fla. Stat. Letters of intent must be postmarked by midnight October

1. *Id.* "By October 15, the department shall send to all hospitals that submitted a letter of intent an application package that will provide the hospitals with instructions for submitting information to the department for selection as a trauma center." § 395.4025(2)(b), Fla. Stat. "In order to be considered by the department, applications . . . must be received by the department no later than the close of business on April 1." § 395.4025(2)(c), Fla. Stat. Then, the Department "shall conduct a provisional review of each application for the purpose of determining that the hospital's application is complete and that the hospital has the critical elements required for a trauma center." *Id.* "After April 30, any hospital that submitted an application found acceptable by the department based on provisional review shall be eligible to operate as a provisional trauma center." § 395.4025(3), Fla. Stat.

After a hospital is approved as a provisional trauma center, "[b]etween May 1 and October 1, the department shall conduct an in-depth evaluation of all applications found acceptable in the provisional review." § 395.4025(4), Fla. Stat. Finally, based on the recommendations from a review team, the Department shall select verified trauma centers by July 1 of the second year following the filing of the letter of intent. § 395.4025(6), Fla. Stat. If the number of qualified provisional trauma centers exceeds the number of available slots for verified trauma centers in the applicable TSA, the Department must apply the tiebreaking process set forth in Florida Administrative Code Rule 64J-2.016(11) to make the final selection(s). Upon final verification, a trauma center is granted approval to operate for seven years, provided it continues to maintain trauma center standards and acceptable patient outcomes, and may thereafter apply for renewal. § 395.4025(6), Fla. Stat.

## ANALYSIS

The standard of review of a trial court's order on a request for temporary injunction is hybrid: the court's factual findings are reviewed for an abuse of discretion, whereas its legal conclusions are reviewed *de novo*. *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1258 (Fla. 2017). An issue involving statutory interpretation is also reviewed *de novo*, and an agency's interpretation of a statute it is charged with administering is

7

generally entitled to greater deference and will be upheld unless clearly erroneous. *Dep't of Revenue v. Graczyk*, 206 So. 3d 157, 159 (Fla. 1st DCA 2016).

"The polestar of a statutory construction analysis is legislative intent." *W. Fla. Reg'l Med. Ctr., Inc. v. See*, 79 So. 3d 1, 8 (Fla. 2012). To discern legislative intent, the court must first look to the plain and obvious meaning of the statute's text, which may be discerned from a dictionary. *Id.* at 9. If the statutory language is clear and unambiguous, the court must apply that unequivocal meaning and may not resort to the rules of statutory construction. *Id.* "Further, courts are 'without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.'" *Bennett v. St. Vincent's Med. Ctr., Inc.*, 71 So. 3d 828, 838 (Fla. 2011) (citation omitted). "All parts of the statute must be given effect, and the Court should avoid a reading of the statute that renders any part meaningless. Moreover, 'all parts of a statute must be read together in order to achieve a consistent whole.'" *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1189 (Fla. 2017) (citations omitted).

"[T]he purpose of a temporary injunction is to preserve the status quo while final injunctive relief is sought." *Planned Parenthood of Greater Orlando, Inc. v. MMB Props.*, 211 So. 3d 918, 924 (Fla. 2017). A temporary injunction is an extraordinary remedy that should be granted sparingly. *Sch. Bd. of Hernando Cty. v. Rhea*, 213 So. 3d 1032, 1040 (Fla. 1st DCA 2017). To obtain a temporary injunction, the movant must establish (1) a substantial likelihood of success on the merits, (2) a lack of an adequate remedy at law, (3) the likelihood of irreparable harm absent the entry of an injunction, and (4) that injunctive relief will serve the public interest. *Id.*; *see also Gainesville Woman Care, LLC*, 210 So. 3d at 1258.

The movant must prove each element with competent, substantial evidence. *SunTrust Banks, Inc. v. Cauthon & McGuigan, PLC*, 78 So. 3d 709, 711 (Fla. 1st DCA 2012). "Clear, definite, and unequivocally sufficient factual findings must support each of the four conclusions necessary to justify entry of a

preliminary injunction." *City of Jacksonville v. Naegele Outdoor Advert. Co.*, 634 So. 2d 750, 754 (Fla. 1st DCA 1994). If the party seeking the temporary injunction fails to prove one of the requirements, the motion for injunction must be denied. *Genchi v. Lower Fla. Keys Hosp. Dist.*, 45 So. 3d 915, 919 (Fla 3d DCA 2010). Here, for the reasons that follow, Bayfront failed to prove with competent, substantial evidence the substantial likelihood of success on the merits and likelihood of irreparable harm elements required for an injunction. As such, we need not decide whether Bayfront proved the remaining requirements for entry of the temporary injunction.

## Substantial Likelihood of Success on the Merits

Appellants argue in part that the trial court erred by finding that Bayfront established a substantial likelihood of success on the merits of its claim. We agree. "A substantial likelihood of success on the merits is shown if good reasons for anticipating that result are demonstrated. It is not enough that a merely colorable claim is advanced." *City of Jacksonville*, 634 So. 2d at 753, *approved sub nom. Naegele Outdoor Advert. Co., Inc. v. City of Jacksonville*, 659 So. 2d 1046 (Fla. 1995); *see also Heslop v. Moore*, 716 So. 2d 276, 279 (Fla. 3d DCA 1998).

Bayfront argued, and the trial court ruled, that pursuant to section 395.4025(5), the Department may not accept a LOI or accept, review, and/or provisionally grant a trauma center application when there is no need (*i.e.*, an open slot) for a trauma center in the TSA. This matter necessitates a brief review of the statutory scheme. Section 395.4025(2) governs the submission of a LOI and application and the ensuing provisional review of the application, and in pertinent part it requires the Department to notify each hospital that it is accepting LOIs, to send an application package to all hospitals that submitted a LOI, and to conduct a provisional review of each timely submitted application to determine whether the application is complete and the hospital has the critical elements required for a trauma center. The provisions of subsection (2) do not confer discretion on the Department and require it to invite and accept a LOI and to accept, provisionally review, and provisionally grant an application without regard to need. Notably, section 395.4025(2)(d)1.

9

authorizes the Department to grant an extension of time to an applicant if the number of applicants in the TSA is equal to or less than the service area allocation, not if the number of applicants is equal to or less than the number of open slots, which further evinces that the Legislature considers need irrelevant at the provisional review stage of the application process. Section 395.4025(3) provides that after April 30, any hospital whose application has been provisionally approved shall be eligible to operate as a provisional trauma center. Section 395.4025(4) governs the in-depth review of applications.

Section 395.4025(5), Florida Statutes, governs the onsite visit by a review team of out-of-state experts and contains the following provision, which is at the heart of the issue: "In addition, hospitals being considered as provisional trauma centers shall meet all the requirements of a trauma center and shall be located in a trauma service area that has a need for such a trauma center." The trial court and Bayfront focused on the word "provisional" in that sentence in interpreting the statute as prohibiting the Department from processing and approving an application at the provisional review stage when there is not an open trauma center slot in the TSA.

The statutory context indicates that section 395.4025(5) is not intended to make need a criteria at or before the provisional review stage. For one, the provision is found in the subsection that governs the onsite review stage; by then, the applicant is considered and operating *as* a provisional trauma center and is being considered *for* licensing as a trauma center—indeed, the provision does not read, "hospitals being considered for provisional trauma center status." Relatedly, the provision requires an applicant to meet *all* the requirements of a trauma center, in addition to be located in a TSA that has a need, whereas an applicant at the provisional review stage need only have submitted a timely and complete application and have the critical elements required for a trauma center. The Legislature's definition of "provisional trauma center" as "a hospital that has been verified by the department to be in *substantial* compliance with the requirements in s. 395.4025 and has been approved by the department to operate as a provisional Level I trauma center, Level II trauma center, or pediatric trauma center" supports this

10

interpretation. *See* § 395.4001(10), Fla. Stat. (2016) (emphasis added). Further, Bayfront's and the trial court's reading of the provision is contrary to the subsections that precede it, which impose specific requirements on applicants and the Department, but do not impose need as one of the prerequisites for submitting, accepting, reviewing, or provisionally granting an application, nor allow need to enter into consideration. *See, e.g., Searcy, Denney, Scarola, Barnhart & Shipley*, 209 So. 3d at 1189 (explaining that all parts of a statute must be given effect and must be read together to achieve a consistent whole). For all these reasons, section 395.4025 is clear and does not require or permit the Department to consider need until the onsite review stage of the application process.

Florida Administrative Code Rule 64J-2.012(1)(a) does not compel a different conclusion as it requires the Department to accept a timely LOI and simply adds that the LOI is non-binding, but preserves the hospital's right to complete an application if a trauma center position is available in the TSA. While the phrasing of the rule may seem to support Bayfront's position, it does not state that a hospital may submit—or, more importantly, that the Department may accept, review, or provisionally grant—an application *only if* there is an available position, which is how the trial court interpreted it. Indeed, rule 64J-2.012(1)(b) requires the Department to send an application package to hospitals that submitted a LOI, and nothing in rule 64J-2.012 requires or allows the Department to consider need at or before the provisional review stage. The tiebreaking procedure found in rule 64J-2.016(11) further supports this interpretation given that it reflects that the number of provisional trauma centers eligible for selection at the end of the application process may exceed the number of trauma centers allocated by rule 64J-2.010(3). As such, Bayfront failed to demonstrate a substantial likelihood of success on the merits of its claim relating to need.

Bayfront also argued, and the trial court found, that Northside cannot begin operations as a provisional trauma center until the conclusion of all administrative proceedings. Section 395.4025 provides that "[a]fter April 30, any hospital that submitted an application found acceptable by the department based on provisional review shall be eligible to operate as a

11

provisional trauma center." § 395.4025(3), Fla. Stat.; *see also* Fla. Admin. Code R. 64J-2.012(1)(g)1. (providing that the Department shall notify each hospital that passed the provisional review process that "the hospital shall operate as a Provisional trauma center beginning May 1"). Section 395.4025(7), Florida Statutes, provides that "[a]ny hospital that wishes to protest a decision made by the department based on the department's preliminary or in-depth review of applications or on the recommendations of the site visit review team pursuant to this section shall proceed as provided in chapter 120," but it does not state what effect an administrative challenge has on a provisional trauma center beginning operation. The parties cited and we found no statute, rule, or appellate decision directly on point. Section 395.4025 sets forth a definite timeline for the trauma center application process and requires a hospital to establish a trauma center prior to submitting an application. It is unclear how a stay on a provisional trauma center's operations would affect the statutory timeline and it would likely endanger the viability of the provisional trauma center because it would be forced to sit idly while any administrative proceeding concludes. Additionally, the cases before us are unique in that the Department had not even received Northside's application at the time of the filing of Bayfront's complaint and motion for temporary injunction and ultimately denied the application at the provisional review stage. As such, we find that Bayfront's assertion that Northside cannot begin operations as a provisional trauma center until the conclusion of all administrative proceedings is at most a merely colorable claim. Therefore, Bayfront failed to establish a substantial likelihood of success on the merits of its claim and the trial court erred by finding otherwise.

**Irreparable Harm**

Appellants also argue that the trial court erred by finding that Bayfront established that without temporary injunctive relief, it would be irreparably harmed by the provisional approval of Northside's application and Northside's immediate trauma operations on May 1st. We agree.

"Irreparable injury will never be found where the injury complained of is 'doubtful, eventual or contingent.'" *Jacksonville*

*Elec. Auth. v. Beemik Builders & Constructors, Inc.*, 487 So. 2d 372, 373 (Fla. 1st DCA 1986) (citation omitted); *see also Biscayne Park, LLC v. Wal-Mart Stores E., LP*, 34 So. 3d 24, 26 (Fla. 3d DCA 2010) ("Wal-Mart's alleged injury was its possible monetary liability resulting from possible future contamination to groundwater through the wells. '[T]his court has previously held that the granting of injunctive relief is improper when a plaintiff's right to recover is based upon a future event,' [citation omitted]; in this case, the future event is the possible future contamination of the groundwater through the wells. Because the alleged injury is speculative, we conclude that it is insufficient to meet the irreparable injury standard.").

In addition, money damages and loss of business to a competitor generally will not suffice to demonstrate irreparable injury. *Agency for Health Care Admin. v. Cont'l Car Servs., Inc.*, 650 So. 2d 173, 175 (Fla. 2d DCA 1995); *see also Stand Up for Animals, Inc. v. Monroe Cty.*, 69 So. 3d 1011, 1013 (Fla. 3d DCA 2011) (explaining that irreparable harm is not established where the harm can be compensated for adequately by money damages and that a judgment for money damages is adequate even where the party alleges that the opposing party may dissipate assets and a money judgment might be uncollectable). However, "evidence of the potential destruction of a business, without a track record from which to calculate the potential loss and with harm of a continuing nature, may in some cases provide sufficient indicia of irreparable harm to support temporary injunctive relief." *U.S. 1 Office Corp. v. Falls Home Furnishings, Inc.*, 655 So. 2d 209, 210 (Fla. 3d DCA 1995) (affirming the order granting the appellee's motion for temporary injunction because the record supported the conclusions that the appellee faced the destruction of its business, it would be difficult to find a basis from which to calculate damages given the absence of a track record, and the harm was ongoing) (citations omitted).

Here, the trial court found that the irreparable harms to Bayfront, once Northside begins operating as a trauma center prior to the conclusion of any administrative challenge, are economic harm due to the dilution of trauma patients, increased difficulty in hiring qualified trauma staff due to competition, increased difficulty in maintaining qualified trauma staff due to

the decreased volume of trauma patients, and decreased quality of trauma care due to the dilution of trauma patients. We conclude that the trial court's finding of irreparable harm is erroneous for a number of reasons. First, all the harms were contingent on the future event of the Department provisionally approving Northside's application. In fact, Gillette conceded that the Department's action of receiving and reviewing Northside's application does not pose any harm and there is no adverse impact until the application is approved, and the Department ultimately denied Northside's application. Accordingly, the alleged harms cannot constitute irreparable injury.

Second, case law is clear that economic harm does not constitute irreparable injury; that is, loss of business and money damages due to a decrease in patient volume do not suffice to demonstrate irreparable injury. To the extent the trial court relied on the exception recited in *U.S. 1 Office Corp.*, that exception is inapplicable because it is undisputed that there was no evidence of the potential destruction of Bayfront's business and Bayfront has a track record from which to calculate losses.

As for the remaining harms of increased difficulty in hiring and maintaining qualified trauma staff and decreased quality of trauma care, the trial court's findings are not supported by competent, substantial evidence. The evidence established that Bayfront made some assumptions in estimating that it would lose 905 of its 2,725 patients, non-compete clauses prevented Bayfront's trauma surgeons from going to work for Northside, the trauma positions at Northside were already filled, and Bayfront was able to maintain its patient volume and quality of care after two new trauma centers opened in its vicinity. The Department's representative testified that 36.35% of severely injured patients in TSA 9 do not receive care in a trauma center and that despite much discussion over the years about the quality of care declining at existing trauma centers as a result of new trauma centers opening nearby, the Department has not received any evidence indicating such and experts have testified that the quality of care did not diminish. Barquist similarly testified that the literature does not indicate what happens to a trauma center's quality of care when its patient volume decreases due to a new competitor and that every existing trauma center has continued to operate after

14

unsuccessfully challenging provisional trauma centers. For these reasons, the trial court erred by finding that Bayfront established irreparable harm absent an injunction.

Based on the foregoing, we reverse and remand for further proceedings consistent with this opinion.

REVERSED and REMANDED with directions.

MAKAR and OSTERHAUS, JJ., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Sarah Young Hodges, Chief Appellate Counsel, Florida Department of Health, Tallahassee; William Dean Hall III, Jones Walker, LLP, Tallahassee, for State of Florida, Department of Health.

Raoul G. Cantero, David P. Draigh, and Ryan A. Ulloa, White & Case LLP, Miami; Stephen A. Ecenia, J. Stephen Menton, and Gabriel F.V. Warren, Rutledge Ecenia, Tallahassee; Thomas E. Warner, Dean A. Morande, and Michael D. Sloan, Carlton Fields Jorden Burt, P.A., West Palm Beach, for Galencare, Inc. d/b/a Northside Hospital.

Geoffrey D. Smith and Timothy B. Elliott, Smith & Associates, Tallahassee, for Appellee, Bayfront HMA Medical Center, LLC d/b/a Bayfront Health – St. Petersburg.

15